1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


MAURY MICROWAVE. INC., a
California corporation,

              Plaintiff,

           vs.

FOCUS MICROWAVES, INC., a
Canadian corporation also known as
Focus Micro Ondes Inc.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 10-03902 MMM (JCGx)


ORDER ON MOTIONS FOR SUMMARY
JUDGMENT


      This action involves a patent dispute between Maury Microwave, Inc. ("Maury") and Focus Microwaves, Inc. ("Focus"). On May 24, 2010, Maury filed a complaint seeking a declaration that it does not infringe certain of Focus's patents, and further that those patents are invalid.[1] On November 22, 2010, Maury amended its complaint to include a claim that Focus is infringing one of Maury's patents.[2] On January 14, 2011, Focus filed counterclaims seeking an injunction restraining Maury from further infringement of the Focus patents in suit.[3]

---

[1]Complaint, Docket No. 1 (May 24, 2010).

[2]First Amended Complaint ("FAC"), Docket No. 25 (Nov. 22, 2010).

[3]Defendant Focus Microwaves, Inc.'s Counterclaims, Docket No. 36 (Jan. 14, 2011).

On May 23, 2011, the court held a hearing regarding the construction of various patent claims whose meaning is in dispute. Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996), the court issued an order setting forth its construction of the disputed terms on March 19, 2012.[4]

On January 30, 2012, the parties filed motions for summary judgment on their respective claims and counterclaims.[5] For the reasons stated below, the court

- grants Maury's motion for summary judgment and denies Focus's motion respecting infringement of the '293 patent, as the undisputed facts demonstrate that Maury has not infringed the patent;

- grants Maury's motion for summary judgment and denies Focus's motion respecting to infringement of the '629 patent, as the undisputed facts show that the patent is invalid for indefiniteness;

- denies both parties' motions respecting Maury's allegation that Focus's conduct in connection with the IMS Symposium infringed the '069 patent, because triable issues of material fact remain as to whether Focus infringed the patent; and

- grants Maury's motion regarding infringement of the '069 patent to the extent it is based on Focus's offer of sale to Northrop Grumman.

---

[4]The court's claim construction order is incorporated by reference in this order.

[5]Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Maury MSJ"), Docket No. 138 (Jan. 30, 2012); Defendant Focus Microwaves, Inc,'s Memorandum of Points and Authorities in Opposition to Maury Microwave, Inc.'s Motion for Summary Judgment ("Maury MSJ Opp."), Docket No. 179 (Feb. 15, 2012); Reply Memorandum ISO Plaintiff's Motion for Summary Judgment ("Maury MSJ Reply"), Docket No. 206 (Feb. 28, 2012).
Defendant Focus Microwave's Memorandum of Points and Authorities ISO Its Motion for Summary Judgment ("Focus MSJ"), Docket No. 154 (Feb. 6, 2012); Memorandum of Points and Authorities in Opposition to Defendant Focus Microwave, Inc.'s Motion for Summary Judgment ("Focus MSJ Opp."), Docket No. 181 (Feb. 15, 2012); Reply in Support of Focus Microwave's Motion for Summary Judgment ("Focus MSJ Reply"), Docket No. 202 (Feb. 28, 2012).

# I. FACTUAL BACKGROUND

## A. History

The history that follows is drawn from the parties' pleadings and is not in dispute. Maury is the designer and manufacturer of noise and load pull systems. Maury holds U.S. Patent No. 7,548, 069 ("the '069 patent") on such a system.[6] Focus also designs and manufactures noise calibration systems and components, and holds patents on several systems, including U.S. Patent Nos. 6,674,293 ("the '293 patent") and 7,034,629 ("the '629 patent").[7] On January 6, 2004, the United States Patent and Trademark Office ("USPTO") issued the '293 patent to Focus's president, Christos Tsironis.[8] Tsironis later assigned his rights in the patent to Focus.[9] The '293 patent protects a two-probe tuner system used in "load-pull set-ups" to measure, characterize, and test radio frequency or microwave devices.[10]

On April 25, 2006, the USPTO issued the '629 patent to Tsironis.[11] Tsironis assigned his rights in this patent to Focus as well.[12] Like the '293 patent, the '629 patent protects a two-probe tuner system; it claims a new tuner initialization algorithm that initializes the radio frequency probes of the microwave tuner horizontally.[13]

On June 16, 2009, the USPTO issued U.S. Patent No. 7,548, 069 ("the '069 patent") to

---

[6] First Amended Complaint ("FAC"), Docket No. 25 (Nov. 22, 2010), ¶ 8.

[7] *Id.*, ¶¶ 13, 20.

[8] *Id.*, ¶ 13.

[9] *Id.*

[10] *Id.*, ¶ 14.

[11] Counterclaim, Docket No. 36 (Jan. 14, 2011), ¶ 7; FAC, ¶ 20.

[12] *Id.*

[13] *Id.*, ¶¶ 22-23.

inventor Gary R. Simpson.[14]  Simpson later assigned his rights in the '069 patent to Maury.[15]  The '069 patent protects a system for conducting measurements on a Device-Under-Test.  The system is comprised of a signal transmission line, an impedance[16] controlling tuner, and a low-loss, electrically small signal coupling probe coupled to the signal transmission line in a non-contacting relationship.[17]

Focus alleges that Maury's Series MT982M multi-harmonic automated tuner infringes Claims 1 through 6 of the '293 patent, and Claim 1 of the '629 patent.  Maury alleges that Focus's IV probe and harmonic tuner, and its integrated IV probe and harmonic tuner infringe Claim 1 of the '069 patent.  The court's claim construction order describes the patents in greater detail.  The parties' briefs cite numerous facts they assert are relevant, as well as countless disputes regarding those facts.  The court details below only those facts necessary to deciding the parties' motions, as well as the evidence supporting those facts.[18]

**B.    Maury's Accused Tuner**

Maury's accused device is its "MT982M01" microwave tuner.[19]  The tuner has two probe

---

[14]*Id.*, ¶ 8.

[15]*Id.*, ¶ 9.

[16]Electrical impedance is "the total opposition to alternating current by an electric circuit, equal to the square root of the sum of the squares of the resistance and reactance of the circuit and usually expressed in ohms."  Mechanical impedance is "the ratio of the force on a system undergoing simple harmonic motion to the velocity of the particles in the system."  See http://dictionary.reference.com/browse/impedance.

[17]Maury's Brief at 4-5.

[18]The court declines to rule on evidentiary objections related to facts that are not relevant to decision of the motions.

[19]Statement of Uncontroverted Facts and Conclusions of Law on Plaintiff's Motion for Summary Judgment ("Maury SUF"), Docket No. 136 (Jan. 30, 2012), ¶ 16; Focus Microwaves Inc.'s Statement of Genuine Issues in Opposition to Plaintiff Maury Microwave, Inc.'s Proposed Statement of Uncontroverted Facts ("Maury SGI"), Docket No. 186 (Feb. 14, 2012), ¶ 16. Another tuner, MT982M02, is also at issue in this litigation, but the parties agree that this tuner is simply a "longer version" of the M01 tuner.  (Maury SUF, ¶ 17; Maury SGI, ¶ 17.)

carriages, each of which has one short probe and one long probe.[20]  The two long probes are of

equal length, as are the two short probes.[21]  The carriages are independently adjustable in relation

to one another, and have a fixed horizontal separation.[22]  An optical sensor in the tuner is designed

_____

Consequently, the court refers exclusively to the MT982M01 tuner in this order.

[20]Maury SUF, ¶ 19; Maury SGI, ¶ 19.

[21]Maury SUF, ¶ 22; Maury SGI, ¶ 22.

[22]Maury SUF, ¶ 20; Maury SGI, ¶ 20; Declaration of James. R. Myers in Support of Plaintiff's Motion for Summary Judgment ("Myers Decl."), Docket No. 156 (Feb. 6, 2012), ¶ 3 and Exh. A.  Focus asserts that the tuner can be manufactured or produced in a number of different ways, with the probes positioned differently depending on the preferences of the individual client.  The evidence it proffers to support this assertion is the declaration of Zacharia Ouardirhi, a Focus employee.  (Declaration of Zacharia Ouardirhi in Opposition to Maury Microwave's Motion for Summary Judgment ("Ouardirhi Opp. Decl."), Docket No. 178 (Feb. 15, 2012).  Paragraphs 9 through 18 of his declaration offer testimony concerning a range of subjects, including the fact that probes of different lengths can be installed on the accused tuner's carriages depending on client preferences.  Ouardirhi offers opinions concerning the proper meaning of certain claim terms in the '293 patent, and makes observations regarding the accused tuner.  His opinions are a mix of lay testimony based on personal observations and scientific testimony based on technical and specialized knowledge.  Because Focus did not designate Ouardirhi as an expert, any opinions he offers that rely on technical or scientific knowledge must be excluded as inadmissible expert testimony.  See *Jerden v. Amstutz*, 430 F.3d 1231, 1239-40 (9th Cir. 2005) (excluding the testimony of a person who"did not merely relate his factual observations of what occurred that was within his competence to describe; instead, he rendered opinions and inferences that he drew from his observations and that, as he himself admitted, he was not competent to provide").

Citing Rule 701, Focus asserts that the statements in Ouardirhi's declaration are merely "factual statements based on [his] personal observations and knowledge of the specific devices at issue in this case."  (Defendant Focus Microwaves, Inc.'s Response in Opposition to Plaintiff Maury Microwave, Inc.'s Objections to and Motion to Strike Declaration of Dr. Fadhel Ghannouchi and Zacharia Ouardirhi, Docket No. 213 (Mar. 12, 2012) at 12); see FED. R. EVID. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702").  Focus is only partially correct.  Some of Ouardirhi's statements are based on observations rather than his scientific testimony.  For example, paragraph 10 states that "[a] probe two inches or longer could extend beyond the carriage walls and the nut and horizontal limit switch of the carriages in the Maury tuner [he] inspected."  (Ouardirhi Opp. Decl., ¶ 10.)  This statement appears to be based on personal

to prevent the carriages from moving closer to each other than a specified distance along both the vertical and horizontal axes.[23]  Maury offers the tuners for sale with a controller that is designed

---

observation.  Ouardirhi can testify to matters he learned as a Focus officer with knowledge of the tuners in question.  See *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Engineering*, 57 F.3d 1190, 1202 (3d Cir. 1995) ("In determining whether a lay witness has sufficient special knowledge or experience to ensure that the lay opinion is rationally derived from the witness's observation and helpful to the jury, the trial court should focus on the substance of the witness's background and its germaneness to the issue at hand.  Though particular educational training is of course not necessary, the court should require the proponent of the testimony to show some connection between the special knowledge or experience of the witness, however acquired, and the witness's opinion regarding the disputed factual issues in the case").

Other paragraphs, however, cross the line between lay and expert opinion.  In paragraph 12, for example, Ouardirhi states that "[o]ver time the components defining the vertical range will change by distances of tens of microns with any microwave tuner of the type at issue in this lawsuit."  (Ouardirhi Opp. Decl., ¶ 12; see also *id.*, ¶ 14 ("accurate, repeatable synthesis of impedance points using pre-matching would not have been possible without that manual tuner")).  These opinions are technical or scientific opinions that can only be offered by an expert; even accounting for Ouardirhi's experience in the field, the fact that he was not designated as an expert weighs against allowing him to offer opinions about matters as technical as these.

Finally, even if Ouardirhi's "observations" are not scientific testimony that falls within of Rule 703, several paragraphs of his declaration offer nothing more than conjecture and speculation about what Maury's tuners may or may not do.  (*Id.*, ¶¶ 9, 11.)  The basis for Ouardirhi's statements is unclear, and Focus proffers no evidence indicating that its employees are competent or qualified to offer opinions concerning the manner in Maury's tuners operate or how Maury responds to customer requests.  Other paragraphs of Ouardirhi's declaration appear to offer opinions about the what various patents claim.  While Focus asserts that the fact that he does not use words like "infringes" or "reads on" means that Ouardirhi is not opining on the proper construction of the patents, a statement such as "[i]nitialization is not the same as the 'initial horizontal position' recited in the claims of the '629 patent" is clearly an attempt to define the meaning of the patent terms.  (*Id.*, ¶ 14; see also *id.*, ¶ 15 (stating that in the '293 patent, "'initial horizontal position' *as claimed* means that the carriages begin measurements . . ." (emphasis added)).)

Applying these standards to Ouardirhi's declaration, the court excludes paragraph 9, paragraph 11, the second sentence of paragraph 14, and all of paragraphs 15-16.

---

[23]Maury SUF, ¶¶ 21, 29; Maury SGI, ¶¶ 21, 29; Eisenhart Rebuttal Report at 15, 27-28; see also Maury SUF, ¶ 51; Maury SGI, ¶ 51 (discussing maintenance of an "air gap" between the probes and the center conductor).  Although the tuner is designed to ensure that the probes do not make contact with the center conductor, Focus asserts that the sensor that is tasked with maintaining separation between the two does not operate reliably.  (Compare Maury SUF, ¶ 21 with Maury SGI, ¶ 21.)  There is no dispute that the tuner is designed to prevent the probes from

1    to obey the sensors and prevent the probes from touching the center conductor.[24]

2         As respects the horizontal positioning of the probes, Maury asserts that the probes of one

3    carriage cannot get closer to the probes of the other carriage than 2.1 inches, and that they cannot

4    be positioned directly next to one another with zero horizontal separation.[25]  It contends that even

5    without the optical sensor, the probes cannot be horizontally adjusted to a position in which they

6    are directly next to each other with no separation between them.  This is so, Maury maintains,

7    because the carriages are wider than the probes themselves, making it impossible for the probes

8    to be adjusted to a position in which they are touching one another.[26]  Each carriage has a nut that

9    protrudes from the side of the carriage.[27]

10        As respects the vertical positioning of the probes, Maury asserts that Focus's expert

11   conceded that when he inspected the tuner, he was "not able to . . . lower the probe, such that the

12

13   _____

14   touching the center conductor.  In discussing the horizontal and vertical range limitations, Focus
     asserts repeatedly that Maury's device does not "reliably" meet the limitations.  The court
15   discusses *infra* the import of Focus's argument that the accused tuner operates differently than it
     was designed to function.

16
     [24]Maury SUF, ¶¶ 22, 30; Maury SGI, ¶¶ 22, 30.  Once again, Focus asserts that the
17   controller does not perform this function reliably or consistently.  There is no dispute, however,
18   that the controller is designed to prevent physical contact between the probes and center
     conductor.

19
     [25]Maury SUF, ¶ 44; Myers Decl., ¶ 4; Declaration of Robert L. Eisenhart in Support of
20   Plaintiff's Motion for Summary Judgment ("Eisenhart Decl."), Exh. B ("Eisenhart Rebuttal
21   Report at 27-28.).  Focus disputes this statement, asserting once again that the sensors do not
     "reliably perform" this function.  The court discusses this contention *infra*.

22
     [26]Maury SUF, ¶ 45; Myers Decl., ¶ 5; Declaration of Darren M. Franklin in Support of
23   Plaintiff's Motion for Summary Judgment ("Franklin Decl."), Exh. J ("Ghannouchi Depo.") at
24   126:23-127:4, 67:15-22, 71:3-75:17.  Focus disputes this, asserting that it is "not impossible" for
     the probes to touch one another.  As noted *infra*, while Focus proffers drawings and documents
25   that purportedly show this, it does not clearly state what they depict.  The court discerns that some
26   refer to tuners and devices that are not at issue in this litigation.

27   [27]Maury SUF, ¶¶ 28, 47; Maury SGI, ¶¶ 28, 47; Myers Decl., ¶ 6.  Focus adduces no
     evidence disputing this fact, but instead asserts that the nuts are "adjustment nuts that may be
28   lengthened, shortened, or completely removed. . . ."  (Maury SGI, ¶ 28.)

probe touched the center conductor, because [there was] a limiting switch on the system."[28]  His measurement of the minimum gap varied from 63 microns to 91 microns.[29]  Maury adduces undisputed evidence that by limiting the vertical movement of the probes, the optical sensors in the tuner limit the highest reflectance or "gamma" the tuner can create.[30]  Absent the sensors, the tuners could achieve a higher reflectance.[31]

The parties also proffer evidence concerning the accused tuner's calibration mechanism, and specifically, whether it performs certain functions claimed in Claim 5 of the '293 patent.[32]

---

[28]Maury SUF, ¶ 53; Franklin Decl., Exh. M ("Ouardirhi Depo.") at 37:24-39:9; Franklin Decl., Exh. J ("Ghannouchi Depo.") at 5:25-6:19.

[29]Maury SUF, ¶ 54; Ghannouchi Depo. at 15:7-14, 19:1-20:9; Ghannouchi Report at 11:28-12:3.  Focus's expert speculates that the measurements differed because of "mechanical use, changing atmospheric conditions . . . , and the consequences of use. . . ."  (Declaration of Zacharia Ouardirhi in Opposition to Maury Microwave's Motion for Summary judgment ("Ouardirhi Opp. Decl."), Docket No 178 (Feb. 15, 2012), ¶ 12.)  Focus does not dispute, however, that the measurements were as Maury reports.  While Maury characterizes a 10-20 micron gap as "large" or "noticeable" (see Franklin Decl., Exh. N ("Tsironis Depo.") at 167:21-168:10), defendant asserts that such a gap in fact "correspond[s] to physical contact" within the meaning of Claim 1's terms.  (Maury SGI, ¶ 55.)  This disagreement is not a factual dispute, but a dispute about the significance of a 10-20 micron gap, which the court addresses below.

[30]Maury SUF, ¶ 33; Maury SGI, ¶ 33; Ghannouchi Depo. at 56:20-25, 57:8-17.

[31]Maury SUF, ¶¶ 34-35; Maury SGI, ¶¶ 34-35; Ghannouchi Depo. at 57:1-17; Ouardirhi Depo. at 32:4-9.

[32]Maury relies heavily on the expert report of Dr. Robert L. Eisenhart to support its factual assertions regarding the calibration process.  Focus contends that Eisenhart lacks a factual basis for his opinions regarding calibration.  It notes his testimony that he did not "know all the steps . . . in [the calibration process] and that his knowledge regarding the process was 'very generic.'" (Declaration of Robert C. Haldiman in Support of Focus Microwaves, Inc.'s Statement of Genuine Issues in Response to Plaintiff Maury Microwave, Inc.'s Proposed Statement of Uncontroverted Facts ("Haldiman Opp. Decl."), Exh. E ("Eisenhart Depo.") at 43:12-44:13.)  Eisenhart stated that he based his opinions on a "manual," and knew "some very generic things" about the pre-positioning of a single probe.  He conceded he had only been shown how a single probe was calibrated, not a "combination of . . . probes."  (Eisenhart Depo. at 45:10-17.)  Asked whether he had a factual basis for "understanding how the rest of the calibration for the Maury 982 tuner" worked, Eisenhart acknowledged that he did not.  (Id. at 46:6-9.)

A lay witness may only testify concerning matters about which he has personal knowledge.

Maury's chief technology officer, Gary Simpson, asserts that "[w]hen Maury calibrates its two-carriage tuner, it does not perform the step of 'de-embedding the S-parameter matrix of the initialized tuner,' as recited in step 5(c) of claim 5."[33]  As noted in the court's claim construction order, the parties have stipulated that "de-embedding the S-parameter matrix of the initialized turner" means "numerically adjusting the S-parameters of the tuner measured in step 5(c) for positions of the microwave probe of the tuning section using the S-parameter matrix of the initialized tuner measured in step 5(b)."[34]  Although they agree on the meaning of the term, they apparently dispute whether the accused tuner performs "de-embedding" during "calibration."  It is undisputed that the accused tuner is capable of performing some type of de-embedding.[35]  Simpson testified that "[t]he de-embedding that we do in the Maury software generally is not part of the calibration.  It's part – it's something we do when we're making measurements."[36]  Focus's expert, for his part, asserts that "[w]e obtained calibration files for the [accused] tuner for a first carriage, saved them, obtained a second file for the second carriage, de-embedded and cascaded them to yield a third and final calibration file, within the meaning of the claims."[37]

Thus, it is undisputed: (1) that the Maury tuner performs "de-embedding" of some sort;

---

FED. R. EVID. 602.  An expert may base his opinion on "facts or data that . . . [he] has been made aware of or personally observed."  FED. R. EVID. 703.  Eisenhart, by his own admission, is unable to identify the facts and data on which he bases his assertions about what happens or does not happen during "the calibration process" as a whole.  Although he appears to have a factual basis for testifying knowledgeably about the calibration of a single probe, the court declines to rely on his testimony to the extent he asserts that certain steps do or do not occur during the entirety of the accused tuner's calibration process.

[33]Declaration of Gary Simpson in Support of Plaintiff's Motion for Summary Judgment ("Simpson Decl."), Docket No. 140 (Jan. 30, 2012), ¶ 4.

[34]Joint Stipulation for Order, Docket No. 85 (May 31, 2011).

[35]Haldiman Opp. Decl., Exh. A ("Simpson Depo.") at 45:12-46:4; Haldiman Opp. Decl., Exh. F ("Ghannouchi Expert Report") at 13-14.

[36]Simpson Depo. at 46:18;47:1.

[37]Ghannouchi Expert Report at 13-14.

and (2) that the de-embedding occurs during "measurement." What remains in dispute is whether the "de-embedding" is of the type claimed in the '293 patent, and whether "measurement" is part of the "calibration" process. The voluminous evidence the parties have submitted is not particularly helpful in clarifying these points. Focus's expert does assert, however, that in his opinion the accused tuner "at least embodies all the claim limitations of claims 5 and 6 by equivalents," in that "the calibration steps . . . perform the same function in the same way to achieve the same result as claimed."[38]

Simpson next contends that Maury's device does not perform steps (a) through (d) of Claim 6;[39] Focus's expert, Ghannouchi, disputes this, asserting that the accused tuner "literally embodies" all of Claim 6's limitations.[40] Simpson also asserts that the tuner need not be placed in a "load pull measurement setup" as the claim requires.[41] Focus contends that Claim 6 does not require setup.[42]

Maury asserts that the accused tuner begins initialization by moving the first and second carriages toward the end walls of the opposite tuner.[43] During initialization, the second carriage

---

[38]*Id.* at 14.

[39]Simpson Decl., ¶ 4.

[40]Ghannouchi Expert Report at 14.

[41]Simpson Decl., ¶ 4. This fact is undisputed, as the only evidence Focus proffers to contradict it is one of the paragraphs in Ouardirhi's declaration that has been excluded.

[42]SGI, ¶ 67. Ouardirhi states only that the tuners are "intended" for use in a load pull measurement setup, not that they must be used in that fashion. (Ouardirhi Decl., ¶ 13.)

[43]Maury SUF, ¶ 86; Maury SGI, ¶ 86; Eisenhart Decl., Exh. B ("Eisenhart Rebuttal Report") at 37-38; Myers Decl., ¶ 10. Focus disputes this assertion, relying on Ghannouchi's report. Ghannouchi states that "one of the probes acts as a primary (or prematching) probe and the other acts as a secondary (or tuning) probe." He contends that "[t]he stepper motor for the secondary probe changes its horizontal position relative to the primary probe in a way that is frequency dependent." (Ghannouchi Report at 15.) Ghannouchi also asserts that "[d]uring testing, we were able to move the tuning carriage to different positions to perform measurements on the tuner for different frequencies. . . . In other words, the initial position of the carriage can be set to different positions depending on the frequency." (*Id.*) The gravamen of the parties'

is not moved toward the first carriage, nor is the initial horizontal position of the second carriage set relative to the first carriage's initial position.[44]

## C.   Facts Relevant to Prosecution of the '293 Patent

Focus's prior two-carriage and two probe manual tuner was described in Focus's Product Note 45, dated November 1997, and in an Applied Microwave & Wireless magazine article dated January 1999.[45]  Models of Focus's two-carriage manual tuner were on sale before March 1, 1999 in the United States.[46]  Focus's two-carriage manual tuner had a number of features, including the following:

- "a slotted transmission airline and two metallic microwave probes that could be moved in, out, and along the airline;"[47]

- probes that "could be inserted individually into the slot of the airline in such a way as for the physical vertical distance between each probe and the center conductor of the airline to be adjustable from a maximum of at least two times the center conductor's diameter to a minimum of zero;"[48]

---

dispute concerns whether the "initial horizontal position" claimed in the '629 patent is the same as the "initialization" process described by Maury's experts.  The court discusses the import of this dispute *infra*.

[44]Maury SUF, ¶¶ 87-88; Maury SGI, ¶¶ 87-88; Eisenhart Decl., Exh. B ("Eisenhart Rebuttal Report at 37-38); Myers Decl., ¶ 10.

[45]Maury SUF, ¶ 68; Maury SGI, ¶ 68; Franklin Decl., Exhs. T-V; Franklin Decl., Exh. N ("Tsironis Depo") at 116:11-22, 120-4-8, 122:9-123:4).

[46]Tsironis Depo. at 117;8-23.  Focus states that a number of Maury's facts concerning patent prosecution were before the patent examiner.  (Franklin Decl., Exh. A; Haldiman Decl., Exh. H.)  It does not, however, dispute Maury's characterization of the facts.

[47]Maury SUF, ¶ 70; Tsironis Depo. at 21:1-7, 123:21-124:4.  Focus states in conclusory fashion that this fact is "incomplete and misleading."  It does not state why this is so.  (Maury SGI, ¶ 70.)

[48]Maury SUF, ¶ 70; Tsironis Depo. at 124:5-21.

- probes that could "approach" physical contact with the center conductor;[49]

- each probe was adjustable independently "from a point that we can call zero;"[50]

- probes that could perform "pre-matching," meaning that it was possible to adjust them to a maximum of one half of wavelength at the lowest frequency;[51]

- probes that could be moved perpendicularly to the axis of the airline and parallel to that airline, permitting maximization of tuner's total reflection beyond the value of 0.85;[52]

- individual reflection vectors that could be made to add in amplitude when the phases coincided;[53]

- and a section closest to the device that could be used as the pre-matching section, while the section farther away from the device could be used as the tuning section.[54]

Focus also produced a prior single-carriage computer-controlled tuner, which was described in its Product Note 41, dated January 1998, and in a Focus catalogue dated June 1998.[55] This single-carriage tuner was sold in the United States before March 1, 1999,[56] and possessed a number of features, including:

- an electro-mechanical microwave tuner with a slotted transmission airline and a metallic probe that could be moved in, out, and along the airline by means of electrical remote

---

[49]Maury SUF, ¶ 70; Tsironis Depo. at 124:22-125:4.

[50]Maury SUF, ¶ 70; Tsironis Depo. at 125:5-11.

[51]Maury SUF, ¶ 70; Tsironis Depo. at 115:4-8, 117:8-11, 129:10-14, 130:5-13.

[52]Maury SUF, ¶ 70; Tsironis Depo. at 130:4-23.

[53]Maury SUF, ¶ 70; Tsironis Depo. at 132:4-7.

[54]Maury SUF, ¶ 70; Tsironis Depo. at 132:23;133:6.

[55]Maury SUF, ¶ 71; Maury SGI, ¶ 71; Franklin Decl., Exhs. R-S; Tsironis Depo. at 243:13-244:11, 248:7-249:24.

[56]Maury SUF, ¶ 72; Maury SGI, ¶ 72; Tsironis Depo. at 168:11-21, 244:12-25, 249:25-251:1.

control;[57]

• a probe that could be inserted into the airline slot so that the vertical distance between the probe and the center conductor was remotely adjustable from a maximum of at least two times the diameter of the center conductor of the airline, to a minimum of zero;[58]

• the ability to adjust the physical horizontal position of the probe along the length of the tuner's airline;[59]

• electrical motors for perpendicular movement and movement parallel to the airline's axis.[60]

The parties agree that a person of ordinary skill in the art of microwave impedance tuning is a professional who has at least an undergraduate degree in electrical engineering, with a focus on microwave measurements, and four to six years of work experience in a laboratory setting.[61] Focus, Maury, and other companies offered automated one-carriage tuners before the March 1, 1999 priority date of the '293 patent.[62] Before Tsironis filed his application for the '293 patent, persons working in the field of microwave impedance tuning knew how to use stepper motors to move probes in tuners.[63]  Tsironis himself testified that he "used stepper motors in [his] first prototype tuner in 1984."[64]

---

[57]Maury SUF, ¶ 73; Maury SGI, ¶ 73; Tsironis Depo. at 168:22-169:11; 250:20-251:14.

[58]Maury SUF, ¶ 73; Maury SGI, ¶ 73; Tsironis Depo. at 169:12-170:1; 251:15-252:3.

[59]Maury SUF, ¶ 73; Maury SGI, ¶ 73; Tsironis Depo. at 170:2-6, 252:4-8.

[60]Maury SUF, ¶ 73; Maury SGI, ¶ 73; Tsironis Depo. at 170:7-12, 252:9-14.  Focus "disputes" that the single carriage tuner could not perform pre-matching, but Maury does not contend that it could.

[61]Maury SUF, ¶ 76; Maury SGI, ¶ 76; Eisenhart Decl., Exh. A ("Eisenhart Report") at 11.

[62]Maury SUF, ¶ 77; Maury SGI, ¶ 77; Tsironis Depo. at 112:10-113:3, 246:7-247:2.

[63]Maury SUF, ¶ 78; Maury SGI, ¶ 78; Tsironis Depo. at 112:14-113:3.

[64]Maury SUF, ¶ 79; Maury SGI, ¶ 79; Tsironis Depo. at 112:12-13.

1

**D.      Focus's '629 Patent**

2        The '629 patent is titled "High Frequency, High Reflection Pre-Matching Tuners with

3  Variable Zero Initialization," and issued on April 25, 2006, based on Application No.

4  10/331,478.[65] Tsironis, who was the inventor, filed the application on December 31, 2002.[66] The

5  application claims priority based on a provisional application, No. 60/343,241, which was filed

6  December 31, 2001.[67]

7        The '629 patent protects a two-probe tuner system, which differs from the prior art "in the

8  way the tuner is designed and manufactured in respect to its initialization mechanism (returning

9  to the fixed zero position) and by consequence in the way the tuner is calibrated and operated."[68]

10 The patent has three claims.  Claim 1 is an independent claim, while Claims 2 and 3 are dependent

11 claims.[69]  Figure 4 of the patent, which describes the pre-matching process, shows that the pre-

12 matching carriage is moved toward the left tuner wall until the carriage's proximity switch

13 activates.  The tuning carriage is then moved toward the pre-matching carriage until the tuning

14 carriage's proximity switch responds when it touches the prematching carriage.  The tuning

15 carriage's position is defined as the "zero reference position"[70]

16        Maury seeks a declaration that it does not infringe Claim 1 of the '629 patent because its

17

18

19        [65]Maury SUF, ¶ 80; Maury SGI, ¶ 80; Franklin Decl., Exh. C ("'629 Patent").

20        [66]*Id.*

21        [67]*Id.*

22
23        [68]Maury SUF, ¶ 81; Maury SGI, ¶ 81; '629 Patent.

24        [69]Maury SUF, ¶ 83; Maury SGI, ¶ 83; '629 Patent, col. 8:53-10:5.

25        [70]Maury SUF, ¶ 82;'629 Patent, Sheet 2 and col. 6:2-9.  Focus disputes this, contending
   that these steps are "only one way to describe the initialization process."  (Maury SGI, ¶ 82.)  It
26 adduces no evidence, however, of other ways to describe what is clearly set forth in the patent.
   Nor does it demonstrate that other descriptions are included in the patent.  Focus also contends
27 that Ghannouchi's expert report disputes Maury's characterization of the claim terms, but the cited
28 pages of his report address the accused tuner, not the claim terms of the patent.

tuner lacks a "means for a variable and frequency dependent horizontal position."[71] Maury contends that this term is indefinite, and that even if it is not, the accused device does not initialize by moving the first carriage toward a tuner wall until the carriage's proximity switch responds, or by moving a second carriage toward the first until the second carriage's proximity switch responds.[72] Focus disputes these factual assertions.[73]

## E.     Maury's '069 Patent

The '069 patent is titled "Signal Measurement Systems and Methods,"[74] and issued with 36 claims.[75] Claims 1 and 22 are the only independent claims; all remaining claims are dependent on either Claim 1 or 22.[76] Claim 1 claims a measurement system for "conducting measurements on a device-under-test (DUT), wherein impedance is controlled or varied over a set of measurement conditions and a parameter or set of parameters measured for each measurement condition. . . ."[77]     Maury alleges that Focus offers for sale an "IV probe" and tuner that, when

---

[71]Maury MSJ at 22-23.   Focus's motion for summary judgment does not address infringement of the '629 patent.  Its motion concerns solely infringement of the '293 patent.

[72]*Id.* at 23.

[73]Maury MSJ Opp. at 17-18.  The court does not discuss the parties' factual disputes in detail, as it concludes that Claims 5 and 6 of the '629 patent are invalid as indefinite.

[74]Maury SUF, ¶ 96; Maury SGI, ¶ 96; Declaration of Paul L. Seeley in Support of Plaintiff's Motion for Summary Judgment ("Seeley Decl."), Exh. A ('069 Patent).

[75]Maury SUF, ¶ 99; Maury SGI, ¶ 99; '069 Patent, col. 12:63-16:8.

[76]*Id.*

[77]SUF, ¶ 100, Maury SGI, ¶ 100;'069 Patent, col. 12:63-13:10.  The claim states: "1. A measurement system for conducting measurements on a device-under-test (DUT), wherein impedance is controlled or varied over a set of measurement conditions and a parameter or set of parameters measured for each measurement condition, the system comprising:
        a signal transmission line;
        an impedance controlling tuner including a signal transmission line segment as at least part of the signal transmission line;
        a low-loss, electrically small signal coupling probe coupled to said signal

coupled together, infringe Claim 1 of the '069 patent.  It also asserts that Focus sells a "wave probe" and tuner that also infringe the patent when coupled together.  Maury proffers expert testimony that supports these contentions.[78]  Focus denies that it offers either of the probes or tuners for sale, but acknowledges that it has displayed an image on a website that includes an image of a test setup, identifying it as an "IV waveform harmonic test setup based on ZVA(tm), NMDG harmonic Phase Reference and Focus IV probes and Harmonic Tuner MPT-1818."[79]  The image is accompanied by a brief description of the product in question:

> "A new measurement setup uses Focus multi-harmonic tuners and Rohde & Schwarz ZVA network analyzer.  Powered by NMDG's hardware and software, it provides insight in real-time transistor dynamic behavio[r] under controlled 3 or 4 harmonic impedance conditions, for faster and more accurate amplifier design."[80]

Focus's website is not interactive, and does not permit visitors to place orders for Focus's goods and services.[81]  The website also contains no pricing or cost estimates for any of Focus's products

---

transmission line in a non-contracting relationship for coupling a sample portion of signals propagating along said signal transmission line to a probe connector or probe transmission line for transmission to a measurement equipment."  (*Id.*)

[78]Eisenhart Expert Report at 11-12 (averring that "Focus' IV probe and impedance controlling tuner, when coupled together, meet the plain meaning of each limitation of [patent claims]" and that "'wave probe,' when coupled together with an impedance controlling tuner" similarly meets claim terms, and further testifying that additional claim terms are violated when the measurement equipment is connected to the "IV/wave probe connector or probe transmission line" or when "the equipment is a vector network analyzer").

[79]*Id.* at 14 (replica of image in question).

[80]*Id.*

[81]Focus SUF, ¶ 21; Focus SGI, ¶ 21; Declaration of Zacharia Ouardirhi ISO Focus Microwaves, Inc.'s Motion for Summary Judgment ("Ouardirhi Decl."), Docket No. 135 (Jan. 30, 2012), ¶ 13.

or services.[82]  Focus has never assembled the ZVX setup depicted on the website.[83]  An entity known as NMDG sent personnel to Focus's Canadian headquarters and those personnel built the setup shown in the photograph.[84]  NMDG gave Focus permission to display the photograph on its website.[85]

Maury also contends that setups called the "ZVX Plus" and the "SWAP-X402 measurement system," which were purportedly assembled and displayed at the 2010 International Microwave Symposium ("IMS") in Anaheim California, infringe the '069 patent.  Ouardirhi attended the IMS on Focus's behalf.[86]  At the symposium, Rohde & Swartz set up a display of a product called the ZVX Plus at its booth.[87]  The ZVX Plus setup used a Focus-manufactured IV probe.[88]  In addition, a company called Verspect-Teyssier-DeGroot ("VTD") was at the trade show, and displayed the SWAP X402 measurement system at its booth.[89]  That system had a number of components, including a Focus-manufactured wave probe and tuner.[90]

The parties agree that Focus did not solicit or secure bids to create the ZVX Plus and SWAP X402 setups at the 2010 IMS,[91] nor did it operate or control either system.[92]  The parties dispute, however, whether Rohde & Schwarz and VTD are Focus's "partners," and whether

---

[82]Focus SUF, ¶ 22; Focus SGI, ¶ 22; Ouardirhi Decl., ¶ 14.

[83]Focus SUF, ¶ 23; Focus SGI, ¶ 23; Ouardirhi Decl., ¶ 14.

[84]Focus SUF, ¶ 24; Focus SGI, ¶ 24; Ouardirhi Decl., ¶ 14.

[85]Focus SUF, ¶ 25; Focus SGI, ¶ 25; Ouardirhi Decl., ¶ 15.

[86]Focus SUF, ¶ 10; Focus SGI, ¶ 10; Ouardirhi Decl., ¶ 4.

[87]Focus SUF, ¶ 11; Focus SGI, ¶ 11; Ouardirhi Decl., ¶ 5.

[88]Maury SUF, ¶ 104; Maury SGI, ¶ 104; Tsironis Depo. at 303:10-17.

[89]Maury SUF, ¶ 105; Maury SGI, ¶ 105; Ouardirhi Depo. at 258:1-11, 307:16-308:2.

[90]Maury SUF, ¶ 105; Maury SGI, ¶ 105; Ouardirhi Depo. at 307:16-308:2.

[91]Focus SUF, ¶ 16; Focus SGI, ¶ 16; Ouardirhi Decl., ¶ 9.

[92]Focus SUF, ¶ 17; Focus SGI, ¶ 17; Ouardirhi Decl., ¶ 10.

Focus assisted those companies in setting up the displays at the symposium.  Maury contends that the testimony of Focus's employees establishes that it was involved in the set ups.[93]  While neither Tsironis nor Ouardirhi identified Rohde & Schwarz or VTD as Focus's partner,[94] Ouardirhi conceded that Focus brought tuners to the symposium that were included in the ZVX setup.[95]  He also acknowledged that, at the time, he knew that NMDG wanted the IV probe brought to the symposium so that it could be used in the ZVX setup.[96]  Although Ouardirhi's testimony on the point is somewhat ambiguous,[97] it is undisputed that neither he nor any other Focus employee had any direct involvement in the physical set up of either the ZCX Plus display or the SWAP-X402

---

[93]Maury SUF, ¶ 104.

[94]Seeley Decl., Exh. D ("Tsironis Depo.") at 303:10-17; *Id.*, Exh. C ("Ouardirhi Depo. at 261:14-25, 264:19-266:20

[95]Ouardirhi Depo. at 265:7-266-10.  The testimony states in full:
"Q: Does this commercial invoice show the equipment that Focus brought to the [ ]2010 International Microwave Symposium in Anaheim, California?
A: Yes, I believe so.
. . .
Q: And is one of these items the Focus tuner that was shown as part of the ZVX set-up at the Rohde & Schwarz booth?
A: Which one was at the . . . it was . . . usually we give them an 1818 MPT.  You see, we have, like one . . . two MPT 1818s.  Yes, I believe one of these two MPT 1818s was the one at . . . which one, I don't know exactly, but one of these two was going to the booth for NMDG, yes.
Q: For Rohde & Schwarz?
A: Yes, the booth of Rohde & Schwarz, they have the NMDG set-up.
Q: So, Focus brought an MPT 1818 into the United States to be shown at the Rohde & Schwarz booth as part of the ZVX set-up?
A: Yes."

[96]Ouardirhi Depo. at 276:20-277:1.

[97]Ouardirhi Depo. at 2656:11-17.  He stated:
"Q: And how did that set-up get created?  Was that put together by Rohde & Schwarz, or you, or . . .
A: No, by NMDG.
Q: Yes, did you . . .were you involved at all in the process of setting up that set-up?  Did you see that set-up at the show?
A: Yes."

display.[98]

Finally, the parties offer evidence of an alleged offer Focus purportedly made to sell the accused IV probe and tuner.  In January 2011, a Focus employee named Ali Boudiaf gave a price quotation to Northrop Grumman for a number of components manufactured and sold by Focus – specifically, a multipurpose tuner and load pull system including external IV probes.[99]  The SWAP-X402 setup cannot be constructed from the components identified in the quotation.[100]  The ZVX setup also cannot be constructed *only* from the components identified, although the parties dispute whether those components comprise a sufficient portion of the setup that the offer infringed Maury's patent.[101]  While the quotation does not include cabling, the parties dispute whether cabling is necessary to connect the IV probe to the tuner.[102]  Whatever the significance of the components identified in the quotation, Ouardirhi later withdrew the quotation and Northrop Grumman did not purchased the components from Focus or any other party.[103]

## II.  DISCUSSION

### A.   Legal Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. PROC. 56(c).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and

---

[98]Focus SUF, ¶¶ 12-14; Focus SGI, ¶¶ 12-14; see also Ouardirhi Focus Decl., ¶¶ 5-8, 10.

[99]Focus SUF, ¶ 27; Focus SGI, ¶ 27; Ouardirhi Decl., ¶ 16.

[100]Focus SUF, ¶ 29; Focus SGI, ¶ 29; Ouardirhi Decl., ¶ 18.

[101]Focus SUF, ¶ 28; Focus SGI, ¶ 28; Ouardirhi Decl., ¶ 17.

[102]Focus SUF, ¶ 30; Focus SGI, ¶ 30; Ouardirhi Decl., ¶ 19.

[103]Focus SUF, ¶¶ 33-35; Focus SGI, ¶¶ 33-35; Ouardirhi Decl., ¶ 22.

discovery responses that demonstrate the absence of a genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. . . .  [S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case.  See *Celotex Corp.*, 477 U.S. at 323.  If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 250; FED.R.CIV.PROC. 56(e)(2).

Evidence presented by the parties at the summary judgment stage must be admissible.  FED.R.CIV.PROC. 56(e)(1).  In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most favorable to the nonmoving party.  See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630-31 (9th Cir. 1987).  Nonetheless, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B.    Legal Standard Governing Patent Infringement

"The law is well established that the determination whether a claim has been infringed requires a two-step analysis.  First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process."  *Carroll Touch, Inc. v. Electro Mechanical Systems*, 15 F.3d 1573, 1576 (Fed. Cir.

1    1993); see also *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1368 (Fed. Cir.

2    2004) (same); *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en

3    banc) (same).

4            To prove infringement, a patentee must show that the accused device meets each claim

5    limitation, either literally or under the doctrine of equivalents. *Deering Precision Instruments,*

6    *L.L.C. v. Vector Distribution Systems, Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003); see also *Kraft*

7    *Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1370 (Fed. Cir. 2000) ("A claim is

8    literally infringed when the accused device literally embodies each limitation of the claim");

9    *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994) ("In order for a

10   court to find infringement, the plaintiff must show the presence of every element or its substantial

11   equivalent in the accused device").

12           While claim construction is a question of law for the court (see *Markman v. Westview*

13   *Instruments, Inc.*, 517 U.S. 370, 290-91 (1996)), whether an accused device infringes the patent

14   claims as construed is a question of fact. See *Strattec Security Corp. v. General Automotive*

15   *Specialty Co., Inc.*, 126 F.3d 1411, 1416 (Fed. Cir. 1997). Similarly, whether an accused device

16   infringes under the doctrine of equivalents is a question of fact. See *Graver Tank & Mfg. Co. v.*

17   *Linde Air Products Co.*, 339 U.S. 605, 609-10 (1950) ("A finding of equivalence is a

18   determination of fact. Proof can be made in any form: through testimony of experts or others

19   versed in the technology; by documents, including texts and treatises; and, of course, by the

20   disclosures of the prior art. Like any other issue of fact, final determination requires a balancing

21   of credibility, persuasiveness and weight of evidence"); *Ferguson Beauregard/Logic Controls,*

22   *Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) ("A determination of

23   infringement, whether literal or under the doctrine of equivalents, is a question of fact").

24   Infringement is properly decided on summary judgment only when no reasonable jury could find

25   that every limitation recited in a claim either is or is not found in the accused device literally or

26   under the doctrine of equivalents. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001),

27   cert. denied, 534 U.S. 1114 (2002).

28           Stated another way, "[s]ummary judgment is appropriate when it is apparent that only one

conclusion as to infringement could be reached by a reasonable jury." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001). "This situation arises when the parties do not dispute any relevant facts regarding the article in question." *Broadcom Corp. v. Agere Systems Inc.*, No. Civ.A. 04-02416, 2004 WL 2009320, *3 (E.D. Pa. Sept. 8, 2004) (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996)).

### C.   Legal Standard Governing Patent Invalidity

A duly issued patent is presumed valid, and the party claiming otherwise bears the burden of proving invalidity by clear and convincing evidence. See, e.g., 35 U.S.C. § 282 ("A patent shall be presumed valid"); *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004) ("[A] party 'seeking to invalidate a patent at summary judgment must submit . . . clear and convincing evidence of invalidity'"); *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003) ("This court gives due weight to a patent's presumed validity under 35 U.S.C. § 282 (2000), and an accused infringer must show by clear and convincing evidence that a patent is invalid"); *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000) ("[T]he party asserting invalidity of a patent must prove the disputed facts by clear and convincing evidence"); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216 (Fed. Cir. 1998) ("Under 35 U.S.C. § 282, a patent is presumed valid and one challenging its validity bears the burden of proving invalidity by clear and convincing evidence").

"[A] patentee has the burden of going forward with rebuttal evidence once a challenger has presented a prima facie case of invalidity." *Mas-Hamilton Group*, 156 F.3d at 1216. If rebuttal is offered, "the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Id.*

### D.   Whether the '293 Patent is Valid, and Whether Maury Has Infringed It

#### 1.   "adjustable independently, from a minimum of zero to a maximum of one half of a wavelength at the lowest frequency of operation"

##### a.   The Term's Meaning

The bulk of the parties' dispute concerns the construction of several crucial terms in Claim

1 of the '293 patent, and whether the accused tuner infringes the claim. As the court held in its claim construction order, Claims 2-6 of the '293 patent are dependent on Claim 1; consequently, if the accused tuner does not infringe Claim 1, it also does not infringe Claims 2-6.[104] *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007); *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed. Cir. 1989) ("One may infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not true. One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim").

The first question related to infringement is whether "the physical horizontal position of each microwave probe" in the accused tuner "is adjustable independently, from a minimum of zero to a maximum of one half of a wavelength at the lowest frequency of operation."[105] The court has construed this term to mean "adjustable independently, from a position in which the probes are directly next to one another with zero horizontal separation between them to a maximum of one half of a wavelength at the lowest frequency of operation, which is mechanically defined by the length of the tuner's airline."[106] The court construed "minimum of zero" to mean "zero horizontal separation" between the probes.[107]

### b.    Whether the Device Literally Infringes

Maury contends that the accused tuner does not literally infringe this limitation. The tuner

---

[104]Focus does not dispute that Claims 2-4 depend on Claim 1, but asserts that Claims 5 and 6 are independent. The court concluded in its claim construction order that Claims 5 and 6 were dependent claims, and declines to revisit that conclusion here. (See Claim Construction Order at 62-63.)

[105]'293 Patent, col. 7:25-28.

[106]Claim Construction Order at 53.

[107]Maury MSJ at 5 (noting the parties' previous agreement regarding this term); Defendant Focus Microwave, Inc.'s Revised Opening Claim Construction Brief ("Focus Claim Construction Brief"), Docket No. 64 (May 4, 2011) at 18 n. 23 ("This much of the Maury proposed construction agrees with Focus'; "adjustable so that there is zero distance between each microwave probe. . .")).

is equipped with an optical sensor that detects when the probe carriages reach a certain distance apart and prevents them from moving closer.  The closest the probes can come to one another is approximately 2.1 inches.[108]  Focus's expert testified that the tuner's design prevented the probes from making physical contact with one another.[109]  Its director of engineering also conceded that the probes could not be placed next to one another, since they are encased in carriages.[110]

---

[108]Eisenhart Rebuttal Report at 27-28.

[109]Ghannouchi Depo. at 126:23-127:4.  The deposition testimony is somewhat confusing, so the court quotes it in substantial part here:

"*Q: Is the Maury Microwave MT982M tuner - does it have probes that are adjustable to a minimum of zero horizontally, as stated in Claim 1?*
*A: I don't think so.*
*Q: No?*
*A: No. . . .*
Q: So the Maury Microwave MT982M tuner does not have probes whose physical horizontal position can be adjustable to a minimum of zero.
A: They – it's possible.  We can adjust them to a minimum of zero.  We can position them where we want. . . .  So you can put them as close – as close as possible.
Q: As close as possible.
A: Yeah.
Q: As close as possible to a minimum of zero?
A: You can do it.
Q: So –
A: It means you can do – the minimum of zero – again, let me make it clear. . . So you have the probe, but you have the carriage.  Okay?  *And physically you cannot get – you have to – you are limited by the carriage – the carriage.  Okay.*

In your case, you are adding this kind of limiting switch or kind of, you know, like basically close, but you stop close by.  And it's your design choice. Okay?

. . .

*Q: So you can get the carriages in the Maury Microwave MT982M tuner as close as possible, but not so that the probes have a zero spacing between them.*
*A: There is no way to get zero spacing between them.  There is no way for practical system to get the two – the two probes connected.*"  *Id.* at 126:23-128:24 (emphasis added).

[110]Ouardirhi Depo. at 67:15-22 ("Q: [C]an the probes in the left carriage be adjusted to a position in which they are directly next to either of the probes in the right carriage of zero (0) horizontal separation between the probes? . . .  A: They are enclosed in here.  No."); *id.* at 71:3-8

Implicitly acknowledging this evidence, Focus argues that the device malfunctions or is capable of being altered or adjusted to become a device that infringes the limitation.[111] That "a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement," however. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001); see also *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir.2005) (rejecting the argument that "to directly infringe, Medtronic need only make devices that are capable of being converted into infringing devices"); *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117-18 (Fed. Cir. 2002) (declining to hold that "infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent"). Consequently, Focus cannot rely on the proposition that third parties can alter the tuner as a basis for its infringement theory.

Focus's stronger argument may be that Maury built the tuner "'intend[ing] or anticipat[ing]' that the device could be modified for use in an infringing manner." *Elantech Devices Corp. v. Synaptics, Inc.*, No. C 06-01839 CRB, 2007 WL 3256229, *6 (N.D. Cal. Nov. 5, 2007) (quoting *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995)); see also *High Tech Medical Instrumentation*, 49 F.3d at 1556 ("If a device is designed to be altered or assembled before operation, the manufacturer may be held liable for infringement if the device, as altered or assembled, infringes a valid patent"). Focus contends that Maury offers probes of multiple lengths, and that depending on the needs of its customer, it can construct tuners of different wavelengths and frequencies. The evidence it proffers, however, is photographs and drawings of (1) *other* Maury probe models, or (2) drawings that do not clearly indicate what they depict, much less confirm that they relate to the accused

---

("Q: Other than adding something physical to the probes to make them touch, is there any other way to make the probes of the left carriage touch either of the two (2) probes on the right carriage? A: Physically touch? No").

[111]Maury MSJ Opp. at 5-6.

tuner.[112]   None of this evidence raises triable issues of fact concerning infringement as a result.

Focus next argues that because customers order tuners for specific purposes, Maury may adjust the position and/or size of the probes to accommodate the customer's intended use.  It asserts that these adjustments may result in probes that make physical contact.  Its only evidence on the point, however, is Ouardirhi's declaration, which states that such adjustments are possible; the court has already excluded this portion of the declaration because Ouardirhi was not designated as an expert, and has no basis for testifying to what may or may not be done.[113]

There is no evidence that Maury places its products in the stream of commerce with the knowledge or intent that they will be adjusted to infringe claim 1 of the '293 patent.  Nor is there any evidence that the accused tuner is constructed so as to permit such alterations.  Focus's evidence is nothing more than conjecture, and a party cannot rely on speculation and hypothesis to defeat summary judgment.  See *Automed Technologies, Inc. v. Microfil, LLC*, 244 Fed. Appx. 354, 360 (Fed. Cir. July 16, 2007) (Unpub. Disp.) ("AutoMed's expert offered little more than speculation regarding the capability of the system to be configured to vibrate pill containers"); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) (holding that expert speculation was insufficient to defeat summary judgment); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (stating that party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."); *R.W. Beck & Assoc. v. City & Borough of Sitka*, 27 F.3d 1475, 1481 (9th Cir. 1994) ("Arguments

[112]Haldiman Opp. Decl., Exhs. N-P; see also Maury MSJ Reply at 8-9; Myers Reply Decl., ¶ 11.

[113]Ouardirhi asserts that "[a] probe two inches or longer could extend beyond the carriage walls in the nut and horizontal limit switch," implying that the probes would likely make physical contact with one another.  (Ouardirhi Opp Decl., ¶ 10.)  He also contends that "[b]ecause the probes may be assembled in any of a variety of manners in the carriages, it is a simple matter of assembly choice for Maury to have assembled the inspected tuner . . . with different length probes."  (Ourardirhi Opp. Decl., ¶ 11.)

Although the court has excluded this paragraph, it is evident from Ouardirhi's statement that at best he is speculating that it is possible for Maury to alter its tuner so that it infringes. Ouardirhi does not state that he personally assembled a Maury tuner so that it infringed.  He also offers no evidence that Maury has actually done so.

based on conjecture or speculation are insufficient to raise a genuine issue of material fact. . .").

Focus also argues an entirely different point – i.e., that the horizontal distance of the probes of claim 1 can be adjusted from A (a minimum of zero) to Z (one half of a wavelength at the lowest frequency of operation) and that the undisputed evidence shows that Maury's probes operate within a range from B+ to Z. Consequently, Focus asserts, the fact that they cannot make physical contact and reach a minimum of zero distance between them is irrelevant. Assuming *arguendo* that Claim 1 claims probes that operate within a specified range, rather than probes capable of achieving the minimum and maximum horizontal distance limitations, the undisputed evidence shows that the accused tuner actually operates slightly *outside* the claimed range.[114] The Federal Circuit has construed range claims narrowly, holding that a patentee cannot claim a specific range during patent prosecution, and then come to court and "propose[ ] that the precisely claimed ranges do not limit" the bounds of the patent. *Jeneric/Pentron, Inc. v. Dillon Company, Inc.*, 205 F.3d 1377, 1382-83 (Fed. Cir. 2000); see also *id.* at 1382 ("Jeneric may not rely on the precise ranges of the claims to distinguish itself from prior art during prosecution and then later construe the ranges more broadly during an infringement action."). Similarly, Focus cannot claim a certain range to distinguish the prior art and render its device patentable, and then argue that a device that does not operate precisely within this range infringes.

In sum, the undisputed evidence compels the conclusion that the accused tuner does not infringe this limitation of Claim 1 of the '293 patent.

> **c.**    **Whether the Accused Tuner Violates the Claim Under the Doctrine of Equivalents, and Whether Prosecution History Estoppel Bars Focus From Asserting That Doctrine**

Focus next asserts that the accused tuner infringes under the doctrine of equivalents. "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002).

---

[114]Eisenhart Opp. Decl., Exh. A at 28-31; Simpson Depo. at 195:16-21, 196:7-8.

1   "Infringement under the doctrine of equivalents requires that the accused product contain each

2   limitation of the claim or its equivalent." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520

3   U.S. 17, 40 (1997). "An element in the accused product is equivalent to a claim limitation if the

4   differences between the two are insubstantial. The analysis focuses on whether the element in the

5   accused device 'performs substantially the same function in substantially the same way to obtain

6   the same result' as the claim limitation." *Aqua Tex Industries, Inc. v. Techniche Solutions*, 419

7   F.3d 1374, 1379 (Fed. Cir. 2005) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339

8   U.S. 605, 608 (1950) (internal quotation omitted)).

9       Maury counters that prosecution history estoppel bars Focus from asserting the doctrine

10  of equivalents as respects both the horizontal and vertical distance terms. Prosecution history

11  estoppel bars a patentee from asserting as an equivalent subject matter that was surrendered during

12  prosecution of the patent application. *AquaTex Industries*, 419 F.3d at 1379; *Salazar v. Procter*

13  *& Gamble Co.*, 414 F.3d 1342, 1346 (Fed. Cir. 2005) ("The doctrine of prosecution history

14  estoppel limits the doctrine of equivalents when an applicant makes a narrowing amendment for

15  purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments

16  made to an examiner"); *Am. Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441, 1445-46 (Fed.

17  Cir.1997). An estoppel may arise as a result of amendments made during prosecution that narrow

18  the scope of a claim to satisfy any requirement of the Patent Act. *Festo Corp.*, 535 U.S. at 733-

19  34. Such amendments create a rebuttable presumption of estoppel. *Id.* at 739-40 (citing

20  *Warner-Jenkinson Co.*, 520 U.S. at 33). The patentee bears the burden of overcoming the

21  presumption of estoppel by "showing that the amendment does not surrender the particular

22  equivalent in question." *Id.* at 740.

23      "[T]he inferences that may reasonably be drawn from the amendment" define the scope

24  of the estoppel. *Id.* at 737-38. Arguments made during prosecution to secure the allowance of

25  claims give rise to estoppel whether or not the arguments were actually necessary to secure the

26  claim. See *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (holding that

27  claims' scope of coverage may change if patentee has "relinquished [a] potential claim

28  construction in an amendment to the claim or in an argument to overcome or distinguish a

reference"); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir.1995) ("Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel"). Moreover, "[a]ny argument-based estoppel affecting a limitation in one claim will also extend to all claims in which that limitation appears." *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1350 (Fed. Cir. 2002).

A patentee is not barred, however, from asserting "equivalents unforeseeable at the time of the amendment and beyond a fair interpretation of what was surrendered," or those that "have only a peripheral relation to the reason the amendment was submitted." *Festo Corp.*, 535 U.S. at 1841. Nor is recourse to the doctrine of equivalents foreclosed where there is "some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* at 738. See also *Felix v. American Honda Motor Co., Inc.*, 562 F.3d 1167, 1182 (Fed. Cir. 2009) ("[T]he patentee may rebut this presumption by "demonstrat[ing] that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent," quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003) ("*Festo II*")).

The amendments at issue here address the horizontal and vertical range limitations of Claim 1. The original claims, which were filed on June 13, 2000, did not include horizontal and vertical range limitations.[115] The range limitations were introduced in mid-2002, after Tsironis personally assumed responsibility for patent prosecution. They were originally included as limitations in dependent claims.[116] A series of office actions and communications with the patent examiner

---

[115]Declaration of Michael R. Annis in Support of Defendant Focus Microwaves' Revised Opening Claim Construction Brief, Docket No. 59 (Apr. 29, 2011), Exh. 4 at 38-40.

[116]*Id.*, Exh. 5 at 28-30 (discussing the amended claims, including range limitations). During prosecution, the broader independent claim eventually became Claim 25, the vertical range

eventually led to a conference call during which the examiner and Tsironis discussed a number of subjects, including the prior art Tsuki and Ishida references.[117]  The examiner's notes of the call state that Tsironis agreed to revise his original independent claim to add the horizontal and vertical range limitations previously included in the dependent claims, thereby narrowing the independent claim.[118]  After submitting this new independent claim, Tsironis's original independent claim and the original dependent claims were canceled.[119]  The examiner concluded that the addition of the horizontal and vertical range limitations distinguished Tsironis's invention over the prior art Tsuki and Ishida references.[120]

The Federal Circuit's decision in *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131 (Fed. Cir. 2004), is instructive in determining the import of this aspect of the prosecution history.  There, the Federal Circuit addressed whether "a dependent claim [that] is merely rewritten into independent form," *id.* at 1141, gives rise to a presumption of surrender.  The appellant in *Honeywell* argued that "although it surrendered its broader independent claims, there is no presumption of surrender because the scope of the rewritten claims themselves has not

---

limitation was included in Claim 26, and the horizontal range limitation was included in Claim 28. (See *id.*, Exh. 4 at 111-13.)

[117]Franklin Decl., Exh. B at MM018118-MM08120.

[118]*Id.*

[119]*Id.* at MM018125 (stating that claims 25, 26, and 28 were canceled).

[120]*Id.* at MM18120 ("Applicant agreed to amending independent claim 25 by examiner's amendment by adding the limitations recited in claims 26 and 28 to clearly distinguish over the prior art.  Added limitations include vertical distance between each probe and the center conductor of the airline to be remotely adjustable from a maximum of at least two times the diameter of the center conductor of the airline to a minimum of zero, and physical horizontal position of [ ]each microwave probe is adjusted independently from a minimum of zero to a maximum of one half of a wavelength at the lowest frequency of operation.  In view of the above applicant agreed to cancel claims 26 and 28 by examiner's amendment"); see also *id.* at MM018126-MM018128 (stating in "Reasons for Allowance" that the "instant application is deemed to be directed to a non-obvious improvement over the inventions patented in [the Ishida patent] and [the Tsuki patent]," and discussing how the range limitations distinguished Tsironis's invention  patent from the prior art).

1   been narrowed." *Id.*  The Federal Circuit disagreed, stating:

2   "It necessarily follows that the presumption of surrender applies only to the

3   amended or newly added limitation; there is no surrender of territory as to

4   unamended limitations that were present in the original claim.  Thus, when a claim

5   is rewritten from dependent into independent form and the original independent

6   claim is cancelled, 'the correct focus is on whether [the] amendment surrendered

7   subject matter.'  Under such circumstances, the surrendered subject matter is

8   defined by the cancellation of independent claims that do not include a particular

9   limitation and the rewriting into independent form of dependent claims that do

10   include that limitation.  Equivalents are presumptively not available with respect to

11   that added limitation." *Id.* at 1143.

12   This is exactly what occurred in this case.  The horizontal and vertical range limitations were

13   originally included as dependent claims; in response to prior art objections, Tsironis added a new

14   revised independent claim that included those limitations, and cancelled the broader independent

15   claim he had originally proposed.  Under *Honeywell*, therefore, a presumption of surrender arises.

16   Focus can rebut that presumption by showing "that the alleged equivalent would have been

17   unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing

18   amendment bore no more than a tangential relation to the equivalent in question, or that there was

19   some other reason suggesting that the patentee could not reasonably have been expected to have

20   described the alleged equivalent." *Festo II*, 344 F.3d at 1368 (quoting *Festo*, 535 U.S. at 741).

21   Focus proffers no evidence that any of these circumstances exists, asserting only that "Dr.

22   Tsironis was acting *pro se*," and that "[h]e did not know what estoppel effects amendments would

23   work."[121]  It suggests that this satisfies the "tangential relation" prong articulated in *Festo*.  Focus

24   cites no authority for the proposition that a patentee acting *pro se* can escape estoppel where others

25   could not, and the court declines to adopt such a broad rule in the absence of controlling

26   precedent.  Consequently, it concludes that Focus has failed to rebut the presumption of surrender,

27   

28   [121]Maury MSJ Opp. at 11.

and cannot assert infringement either of the horizontal or the vertical range limitations in Claim 1 under the doctrine of equivalents.

Focus's doctrine of equivalents arguments suffers from an additional, more fundamental problem – the fact that it has failed to identify how the accused tuner performs the same function as the device claimed in Claim 1 in an equivalent manner.   While Focus disputes Maury's assertion that it is estopped to assert infringement under the doctrine of equivalents, it offers no explanation as to why the doctrine otherwise applies.   "To avoid a grant of summary judgment of non-infringement by equivalents, the patentee must present 'particularized evidence and linking argument as to the "insubstantiality of the differences" between the claimed invention and the accused device, or with respect to the "function, way, result" test.'"   *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1382 (Fed. Cir. 2007); see also *id.* at 1383 ("the patentee has the burden to present particularized evidence that links the accused products to the patent on a limitation by limitation basis").   This Focus has not done.

The Federal Circuit has held that "[t]he doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent."   *Schoell v. Regal Marine Industries, Inc.*, 247 F.3d 1202, 1211 (Fed. Cir. 2001).   As a result, the party asserting the doctrine bears the burden of presenting argument and evidence demonstrating that it applies. Focus offers a number of conclusory statements regarding the applicability of the doctrine; because it has failed to offer particularized argument or evidence, however, it has not carried its burden.   See *Motionless Keyboard Co.*, 486 F.3d at 1382 ("MKC only presented the district court with conclusory statements about equivalents"); *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) ("Having presented the district court with only conclusory statements regarding equivalence, without any particularized evidence and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device, or with respect to the 'function, way, result' test, PC Connector is now foreclosed from invoking the substantive application of the doctrine of equivalents"); *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) ("The only evidence Zelinski submitted to the trial court on

equivalence was a statement by a patent attorney expert.  The district court properly characterized this statement as conclusory due to the expert's assertion without any further explanation that '[b]ecause there is literal infringement, there is infringement under the doctrine of equivalents,'" quoting the district court opinion); *Street Flyers LLC. v. Gen-X Sports, Inc.*, No. 01 Civ. 9669 (MBM), 2003 WL 21998960, *9 (S.D.N.Y. Aug. 22, 2003) ("It is Street Flyers' burden to show equivalence.  Yet Street Flyers submits no evidence.  Street Flyers' memorandum – only two pages long – begins by stating that claim 1 of [the] '964 Patent is infringed under the doctrine of equivalents.  However, Street Flyers' memorandum does not articulate an argument under the doctrine of equivalents.  Rather, Street Flyers responds in conclusory fashion to several arguments made by Gen–X").[122]

Because prosecution history estoppel forecloses Focus from asserting infringement of the vertical and horizontal range limitations under the doctrine of equivalents, and because Focus has not made particularized arguments or proffered evidence concerning equivalence, the court concludes that Focus's assertion that Maury has infringed the range limitations of Claim 1 under the doctrine of equivalents does not preclude the entry of summary judgment in Maury's favor.

> **2.      "To a minimum of zero, said minimum distance corresponding to physical contact between the probe and the center conductor"**
>
> ### a.      The Term's Meaning

The fact that the accused tuner does not meet a single limitation in Claim 1 would ordinarily end the court's analysis.  See *Laitram Corp.*, 939 F.2d at 1535 ("Since the failure to meet a single limitation is sufficient to negate infringement of the claim, we will limit our analysis accordingly").  As other grounds exist for entering summary judgment in favor of Maury, however, the court discusses some of them below.

The parties dispute whether the accused tuner's probes can be inserted into the airline in

---

[122]Focus may believe that equivalence is self-evident from the briefs and evidence presented.  In an area as specialized and technical as this one, however, it is not possible for the court to synthesize the argument and evidence submitted and determine that the doctrine applies in the absence of a particularized explanation of the issue by Focus.

such a way that the "physical vertical distance [is] remotely adjustable from a maximum of at least two times the diameter of the center conductor of the airline to a minimum of zero, *said minimum distance corresponding to physical contact between the probe and the center conductor.*"[123]  The court's claim construction order concluded that this term was properly construed as "<u>adjustable to the point where the probes make physical contact with the center conductor.</u>"[124]

### b. Whether the Accused Tuner Literally Infringes This Limitation

The parties dispute whether the probes of the accused tuner are capable of making contact with the center conductor.  The accused tuner contains limit switches and optical sensors designed to detect the downward movement of the probes; when the probes reach a certain distance from the center conductor, the switches and sensor stop any further downward movement.[125]  Focus's expert, Ghannouchi, testified that during his testing of the accused tuner, the closest physical proximity he could achieve between the probes and the center conductor was a distance of 63 microns.[126]  Tsironis testified that a gap of 10 to 20 microns could result in a "relatively large" measurement error.[127]  Simpson, Maury's chief technology officer, conceded that the accused tuner's probes "go down to one or two mils," but observed that while such a gap "is really tiny, . . . it's a big gap electrically."[128]  Consequently, the undisputed evidence establishes that as designed and manufactured, the accused tuner's probes are not capable of making physical contact

---

[123]'293 Patent, col. 7:17-25.

[124]Claim Construction Order at 50.

[125]Eisenhart Rebuttal Report at 17-18; Ghannouchi Depo. at 53:3-55:24; Ouardirhi Depo. at 26:17-29:15.

[126]Ghannouchi Depo. at 15:7-14, 19:1-20.

[127]Tsironis Depo. at 167:21-168:10.

[128]Annis Decl., Exh. B ("Simpson Depo.") at 163:5-164:2.  A mil is a unit of length equal to 0.001 inch, close to about 25 microns.

with the center conductor along a vertical axis.[129]

[129]Ghannouchi's expert report states:

"Maury allegedly maintains a gap of 1.4 mils or 35 microns between the probe and center conductor. This distance 'corresponds' to zero – it is within the tolerances of the tuner mechanics (about 10-20 microns) and the temperature and supply voltage variability of the optical limit switch performance (about 10-20 microns) and the alignment variability during the lifetime of the tuner. It is not possible to maintain such a fine gap at all times. Hence, if the software is initiated for a certain stepper motor position to put the probe 35 microns away from the center conductor, during the lifetime of the tuner, the actual position of the probe at that stepper motor position will vary from the originally initialized 35 microns. Accordingly, there will be mechanical touching in a tuner whose zero vertical position is set at 35 microns." (Ghannouchi Report at 11:13-17. at 11:14-26.)

The "alleged" source of Ghannouchi's premise that Maury maintains a 35 micron gap is information exchanged during settlement discussions under what Maury denominates "a Rule 408 agreement." See FED. R. EVID. 408 (excluding as inadmissible "conduct or a statement made during compromise negotiations"). Although the agreement is not part of the summary judgment record. Maury has adduced evidence that this information was exchanged in the midst of settlement discussions. (Franklin Decl., Exh. D (Nov. 11, 2010 email from plaintiff's counsel to defense counsel); Ghannouchi Depo. at 13:11-14:14 (stating that Focus's counsel had given Ghannouchi information regarding the 35 micron gap). Rule 408 plainly requires the exclusion of such evidence, and an expert's reliance on such information warrants the exclusion of any opinion testimony based on it. See *Nomo Agroindustrial SA DE CV v. Enza Zaden North America, Inc.*, No. CV 05-351-TUC-FRZ, 2009 WL 211085, *3 (D. Ariz. Jan. 29, 2009) (agreeing with a party that "factual statements made during settlement negotiations are clearly within the scope of Rule 408's prohibition against admission and admitting such statements would clearly undercut the public policy goals of Rule 408," and excluding statements made during "during the private, confidential settlement negotiations"); *Irwin Seating Co. v. International Business Machines Corp.*, No. 1:04-CV-568, 2007 WL 518866, *3-4 (W.D. Mich. Feb. 15, 2007) (excluding expert testimony that was "consciously or unconsciously affected by" information exchanged during settlement discussions); *Irwin Seating Co. v. International Business Machines Corp.*, No. 1:04-CV-568, 2006 WL 3446584, *3 (W.D. Mich. Nov. 29, 2006) (striking expert declarations that relied on information provided by a party's lawyers during settlement discussions, and stating "[t]he court need not find a bad intent on the part of Irwin's lawyers in furnishing all of these materials to their experts. What the court does find, whatever the intent, was that these documents were furnished on purpose for the experts to review, and they were in fact reviewed").

Moreover, while an expert can rely on inadmissible evidence in rendering opinions, FED. R. EVID. 703, he can do so only as "a basis for [his] expert opinion and not as substantive evidence" of the fact in question. *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997); see also *Matsuura v. E.I. du Pont De Nemours and Co.*, Civil Nos. 96-01180 SOM-LEK, 2006 WL 2734291, *8 (D. Haw. Sept. 22, 2006.). Consequently, even if

Focus hypothesizes, however, that, under various circumstances, the probes can make physical contact with the center conductor.  As noted, the fact that Maury had to repair a certain number of devices to ensure that they did not touch the center conductor only supports the notion that as designed and sold, the tuner does not infringe Focus's patent.  See *Bettcher Industries, Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 649 (Fed. Cir. 2011) ("[T]he infringement theory that Bettcher argues it was effectively precluded from presenting to the jury carries no weight.  It is undisputed that the accused blades do not infringe as sold.  The record on appeal does not support the view that Bunzl's blades ever start to infringe, let alone that they always, necessarily, or even usually wear to the allegedly infringing shape.  Thus, Bettcher cannot establish either intent or the absence of a substantial non-infringing use for the accused blades").

Focus cites *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358 (Fed Cir. 2009) for the proposition that "[a]pparatuses capable of infringing do infringe."  It suggests that Maury makes adjustments to the accused tuners to suit its customers' needs, and that these adjustments result in the probes making physical contact with the center conductor.[130]  *Revolution Eyewear*, however, addressed a circumstance in which the accused devices were not "specifically designed or sold to be used" in an infringing manner, but were "nevertheless capable of being used in that way."  *Id.* at 1370.  Focus relies on a different notion – that Maury constructs devices

---

Ghannouchi's opinion were admissible, it would be mere speculation as to what *might occur* if Maury maintained a 35 micron gap.  It could not serve as evidence that Maury actually maintains such a gap.

[130]Focus MSJ Reply at 10.  Focus's argument on this point is as follows:
"Document MM002081 is the MT982 specification drawing of the mounting bracket.  The oval hole is 0.20 inches tall.  0.20 inches is 5080 microns.  If the bolt is half that thick, Maury has 2540 microns to use to assemble these individual, made to order tuners with the probes close enough to the center conductor to meet customer specifications."  (*Id.*)

Although the import of this statement is far from clear, it appears that Focus is speculating that Maury engages in certain conduct to raise a triable issue; there is no evidence that Maury in fact assembles tuners in this manner.  Moreover, even if Maury assembles tuners to order with probes "close enough to the center conductor," this does not constitute evidence that it assembles tuners in which the probes are likely to make contact with the center conductor.  This, of course, is the crucial inquiry here.

for clients that infringe.  "[A] device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim."  *High Tech Medical Instrumentation*, 49 F.3d at 1555; see also *Hap Corp. v. Heyman Mfg. Co.*, 311 F.2d 839, 843 (1st Cir. 1962) ("The question is not what [a device] might have been made to do, but what it was intended to do and did do. . . .  [T]hat a device could have been made to do something else does not of itself establish infringement"), cert. denied, 373 U.S. 903.

Although Focus does not clearly frame its argument these terms, it appears to assert that even if the accused tuner is not designed to infringe, and even if Maury does not intend or anticipate that it can will altered to infringe, the device is constructed in such a fashion that it has a high probability of infringing.  Focus cites the statements of a Maury employee named Hernandez, who testified at deposition that during the nine years he has worked at the company, he has repaired fifty tuners that were damaged when the probes came into contact with the center conductor.[131]  It is unclear from Hernandez's testimony, however, whether he was referencing the accused tuner, or some other tuner.  Indeed, Hernandez subsequently submitted a declaration stating that "none of the tuners that [he had] seen come back from customers for repair [were] two-carriage tuners, including the models that I am informed [Focus] has accused of infringing its patents."[132]  Focus did not object to this declaration, and it does not directly contradict Hernandez's deposition testimony, as that testimony did not clearly indicate whether Hernandez was discussing the accused tuner.  Rather, it clarifies that Hernandez was not speaking of the accused tuner when he discussed making repairs to tuners whose probes had come into contact with the center conductor.  See *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (stating that a subsequent declaration can be deemed a sham affidavit only if it "flatly

---

[131]Haldiman Decl., Exh. D (Hernandez Depo. at 105:8-20).

[132]Declaration of Francisco Hernandez in Opposition to Defendant Focus Microwave, Inc.'s Motion for Summary Judgment ("Hernandez Decl."), Docket No. 161 (Feb. 13, 2012), ¶ 4. Focus did not object to this testimony, and it does not directly contradict Hernandez's deposition testimony, as that testimony did not clearly indicate whether Hernandez was discussing the accused tuner.

contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment," and that a contradictory declaration is not sham if it "is introduced to explain portions of earlier deposition testimony," of is "the result of an honest discrepancy, a mistake, or the result of newly discovered evidence").  As a result, Focus's attempt to generate a triable issue of fact based on Hernandez's deposition testimony is unavailing.

In other respects, in fact, Focus relies on Hernandez's declaration, characterizing his testimony as an admission that "Maury's switches are designed to be mounted at different positions for different purposes."[133]  Hernandez made no such admission, however.  He stated that "Maury uses optical sensors to stop the probes in its two-carriage tuners before they approach the point at which they might touch the center conductor. . . .  Maury sometimes mounts the optical sensors in its single-carriage tuners closer to the center conductor than in the two-carriage tuners that Focus has accused of infringement, thus allowing the probes in the single-carriage tuners to get closer to the center conductor."[134]  As can be seen, Hernandez was merely attempting to explain why in single carriage tuners, there is a greater possibility that the probes will make contact with the center conductor.  Nowhere does he state that Maury's two-carriage tuners are frequently adjusted so that the probes come closer to making contact with the center conductor.

Finally, Focus relies on a portion of Eisenhart's deposition testimony, during which he was shown various photographs of the accused tuner that was present for inspection.  Eisenhart stated that he saw "scratches" on the surface of the center conductor;[135] Focus argues this constitutes evidence that the probes do, in fact, make contact with the conductor.  The testimony on which it relies is as follows:

"Q: I'll put it to you that those scratches were caused by contact with the probes.

A: Are you speculating that?  Because the probes don't move in the direction of the scratches on here.  The probes move up and down, and the most they can do is

---

[133]Focus MSJ Reply at 9-10.

[134]Hernandez Decl., ¶ 5.

[135]Eisenhart Depo. at 193:8.

touch it.  Or if they're touching it, move along it; they can scratch it along the length.  But these scratches are all random.  They're kind of all over the place.

Q: So you are testifying, to a reasonable degree of certainty, that the contact with the probes absolutely could not have made those scratch marks that we agree are on the center conductor?

A: Well, there are some scratches on it that seem to be axial that could have been made with the probes, I'll grant that.  But not most of the scratches that are on here."[136]

Later, Eisenhart was asked to mark the axial scratches:

"Q: Just tell me the ones that a probe made or could have made.

A: It didn't show up very well.  And it's kind of hard to tell.

. . .

A: Well, the other issue here is that if you're putting light from the top, you['re] going to get a reflection line right down the center line of the center conductor.  So it's hard to determine whether that spot is due to a scratch or just due to the light.  In fact, I can't really tell.  I mean, this one, I'll grant that this portion looks like a scratch right in here. . . .  This portion down here is a little bit harder to tell that."[137]

The most that this testimony establishes is that (1) the center conductor is scratched, and (2) some of the scratches are axial.  Nowhere does Eisenhart state that the scratches were caused by contact between the probes and the center conductor. He stated only that the axial scratches "could have been," and was then unable to identify axial scratches because of the light being used to illuminate the center conductor.  Instead, it appears that Focus's counsel, who was questioning Eisenhart, posited that the scratches were due to physical contact between the probes and center conductor. Focus, moreover, fails to adduce any additional evidence that there is a causal connection between

[136]*Id.* at 192:20-193:11.

[137]*Id.* at 193:15-194:15.

the probes making physical contact with the center conductor and the scratches. Eisenhart's testimony fails to raise triable issues of fact concerning infringement. See *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

In sum, Focus has adduced no evidence that the accused device, as manufactured and intended for use, infringes this limitation of Claim 1.[138] This provides another basis for granting summary judgment in favor of Maury.[139]

### 3.     Whether the '293 Patent is Invalid as Obvious

A patent will be found to be invalid under 35 U.S.C. § 103(a) if the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). "The ultimate judgment of obviousness is a legal determination." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). Summary judgment

---

[138]As noted, Focus is estopped from asserting infringement under the doctrine of equivalents as respects the vertical range limitation. Consequently, it can argue only that the accused tuner directly infringes.

[139]Focus also contends that Maury infringes Claims 2 through 6 of the '293 patent. The parties do not dispute that Claims 2-4 are dependent on Claim 1. (Maury MSJ Opp. at 16.) The court's claim construction order concluded that Claims 5 and 6 are also dependent on Claim 1, since the claim terms clearly claim a calibration method "for electromechancial microwave tuners *as in claim 1*." (Claim Construction Order at 61-62.) As Maury has not infringed Claim 1 of the patent, it cannot have infringed claims that are dependent on that claim. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1553 n. 10 (Fed. Cir. 1989) ("Infringement of an independent claim would result in the same damage award as would infringement of all claims dependent thereon and non-infringement of an independent claim carries with it non-infringement of all claims dependent thereon."); see also *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (citing *Wahpeton Canvas Co.* with approval and rejecting an argument that a party that had not infringed an independent claim nonetheless could be found to have infringed dependent claims).

is appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors." *Id.*

The Federal Circuit has held that "[a] district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1371 (Fed. Cir. 2004); *see also Nystrom v. TREX Co., Inc.*, 339 F.3d 1347, 1351 (Fed. Cir. 2003) ("[T]he district court could have dismissed the counterclaim without prejudice (either with or without a finding that the counterclaim was moot) following the grant of summary judgment of non-infringement"); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir.1998) ("We have previously held that a district court has discretion to dismiss a counterclaim alleging that a patent is invalid as moot where it finds no infringement").

Exercising this discretion, numerous district courts have declined to decide invalidity after entering summary judgment of non-infringement. See, e.g., *Absolute Software, Inc. v. Stealth Signal, Inc.*, 731 F.Supp.2d 661, 669 n. 22 (S.D. Tex. 2010) (declining to reach the issue of a claim's validity where the defendant was found not to infringe the claim); *Von Holdt v. A–1 Tool Corp.*, 714 F.Supp.2d 863, 873 (N.D.Ill. 2010) ("In light of the fact that the court has granted summary judgment to the defendants with respect to the patent infringement claim . . . the court need not reach the issue raised in the defendants' counterclaims"); *Frazier v. Wireline Solutions, LLC*, No. C–10–3, 2010 WL 5067671, at *8 (S.D.Tex. Dec.6, 2010) (declining to address defendant's motion for summary judgment of invalidity after granting summary judgment of non-infringement); *see also Voter Verified, Inc. v. Premier Election Solutions, Inc.*, No. 6:09–cv–1968–Orl–19KRS, 2011 WL 3268576, *1 (M.D. Fla. July 29, 2011) ("In view of the case law on this subject and the unique facts and circumstances of the present action, including the Defendants' prior pleading, the findings regarding non-infringement relating to each and every claim of the asserted patents and each of the Defendants, the apparent complexity of the invalidity issue, the Court's heavy caseload, and the inordinate amount of time it would take to address the

validity of the ninety-two claims presently at issue, the Court will not address the Defendants' remaining counterclaims of invalidity").

Given the court's conclusion that Maury has not infringed any of claims 1, 5 and 6 of the '293 patent, the court exercises its discretion and declines to determine whether the '293 patent is invalid.  It does so, in part, because the parties provided minimal briefing of the issue as compared with their extensive treatment of infringement issues, and because their presentation of evidence related to invalidity was confusing and difficult to follow.

### E.    Whether the '629 Patent is Valid

Focus also contends that the accused tuner infringes Claim 1 of the '629 patent; Maury responds that the claim is indefinite and therefore invalid.  A patent claim is invalid under 35 U.S.C. § 112(2) for indefiniteness when the scope of the claim is not "sufficiently definite to inform the public of the bounds of the protected invention." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  "Claims need not be plain on their face in order to avoid condemnation  for indefiniteness; rather, claims must only be amenable to construction." *Wellman, Inc. v. Eastman Chemical Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011) (citing *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)). The Federal Circuit has held that a claim is indefinite if "a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Id.* (citing *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).  It has cautioned that the standard for proving indefiniteness is "exacting," and is not met simply because construction of the claim is difficult.  See *id.* ("Proof of indefiniteness requires such an exacting standard because claim construction often poses a difficult task over which 'expert witnesses, trial courts, and even the judges of this court may disagree,'" quoting *Exxon Research & Eng'g Co.*, 265 F.3d at 1375).  Thus, "'[o]nly claims not amenable to construction or insolubly ambiguous are indefinite.'" *Id.* at 1250 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (internal quotation omitted)).

The crucial terms of the '629 patent that are in dispute are "[m]eans of remotely positioning two independent mobile carriages" and "means for a variable and frequency dependent initial

horizontal position."   In its claim construction order, the court concluded that both terms were indefinite.  Specifically, it found that the patent specification did not disclose a structure corresponding to the "means of remotely positioning,"[140] and that the "means for a variable and frequency dependent initial horizontal position" was a means-plus-function term that was not clearly linked to a structure disclosed in the patent specification.[141]

Because the court has found that these terms are indefinite, it is compelled to find that Claim 1 of the '629 patent is indefinite as well, and is therefore invalid.  "A patent claim which fails to meet the definiteness requirement is invalid."  *Acacia Media Technologies Corp. v. New Destiny Internet Group*, 405 F.Supp.2d 1127, 1132 (N.D. Cal. 2005); see also *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004) ("Section 112, paragraph 2, of the Patent Act, 35 U.S.C. § 112, ¶ 2, requires that the claims of a patent "particularly point [ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention"). Consequently, the court grants Maury's motion for summary judgment of invalidity of Claim 1 of the '629 patent, and denies Focus's cross-motion.

### F.   Whether Focus Has Infringed the '069 Patent

Focus does not contend that Maury's '069 patent is invalid; it asserts only that it has not infringed the patent.  To prevail on a direct patent infringement claim under § 271, Maury must show that, without consent, Focus made, used, offered to sell, or sold the patented invention within the United States, or "imported into the United States [the] patented invention during the term of the patent. . . ." 35 U.S.C. § 271(a).  In addition to arguing that Focus directly infringed Claim 1 of the '069 patent, Maury also contends that Focus induced infringement of the patent under 35 U.S.C. § 271(b).[142]

---

[140]Claim Construction Order at 69.

[141]Claim Construction Order at 82.

[142]Although the parties' briefing is not clear, Maury appears to assert that (1) that Focus directly infringed the patent by making an offer of sale to Northrop Grumman, (2) that Focus induced infringement of the patent by providing its IV probe and tuner to Rohde & Schwarz for assembly and display at the IMS Symposium, and (3) that Focus induced infringement by

providing its wave probe and tuner to VTD for the same purpose.  (Focus MSJ Opp. at 23-24.)
Focus contends that these theories were not clearly stated in Maury's in infringement contentions,
that it failed to seek leave to amend those contentions, and that consequently, it is barred from
asserting these infringement theories now.  (See Haldiman Decl., Exh. K.)

Focus relies heavily on *O2 Micro International Ltd. v. Monolithic Power Systems, Inc.*,
467 F.3d 1355 (Fed. Cir. 2006), which confirmed a district court's authority to limit a party's
ability to assert infringement theories to those reflected in its infringement contentions.  See *id.*
at 1367-68 ("Given O2 Micro's delay in moving to amend its infringement contentions and its lack
of adequate explanation for this delay, we conclude that the district court did not abuse its
discretion in finding a lack of diligence and therefore a lack of 'good cause.'  Having concluded
that the district court could properly conclude that O2 Micro did not act diligently in moving to
amend its infringement contentions, we see no need to consider the question of prejudice to
MPS").  In *O2 Micro International*, the Federal Circuit reviewed a case decided in the Northern
District of California, where a party had clearly violated the district's patent rules.

Focus asserts that the court "adopted" Rules 3-1 and 3-3 of the Northern District patent
rules in its scheduling order, and that the parties were therefore bound to follow those rules.  The
court never adopted the Northern District's patent rules, however.  The only requirement the court
set was that the parties should serve their infringement and invalidity contentions on one another
by certain dates.  (See Minutes of Scheduling Conference, Docket No. 43 (Nov. 22, 2010).)
Nowhere does the order explicitly adopt any provisions of the Northern District patent rules,
particularly the rules governing the amendment of invalidity or infringement contentions.  See *O2
Micro International*, 467 F.3d at 1362-63 (discussing U.S. Dist. Ct. N.D. Cal. Patent L.R. 3-6
and 3-7, which governs amendment of contentions).  Consequently, the court declines to limit
Maury's infringement arguments on that basis.

It does appear, however, that Maury's infringement contentions have shifted during the
course of this litigation.  In Maury's original infringement contentions, it identified "the following
acts of *direct* infringement":

> "(1) the demonstration of the ZVX Plus setup with Focus hardware at the Rohde
> & Schwarz booth at the 2010 International Microwave Symposium in Anaheim,
> California, and (2) the demonstration of a SWAP-X402 set up with Focus hardware
> at the [VTD] booth at the symposium.  (3) Focus has also advertised the ZVX Plus
> setup with Focus hardware on its website . . . and, on information and belief,
> maintains a sales and support manager, Dr. Ali Boudiaf, in the Los Angeles area."

Haldiman Decl., Exh. K ("Maury Infringement Contentions") (emphasis added).
Focus asserts, and Maury does not dispute, that Maury never amended or supplemented these
contentions.  Maury reiterated them, in fact, in an interrogatory response; although it stated that
the "applicable statutory subsections of 35 U.S.C § 271 are subsections (a) and/or (b)," it asserted
only that Focus was guilty of "direct infringement."  (*Id.*, Exh. M at 16-18.)  The interrogatory
response identified as a further infringing act "the offer of sale of the Focus IV probes and Focus
tuner . . . [to] Northrop Grumman in Redondo Beach, California."  (*Id.* at 18.)

Maury does not address this issue in its briefs.  It is readily apparent, however, both from
the infringement contentions and Maury's response to Focus's special interrogatories that while

In order to be liable for patent infringement of a "system claim" like the one at issue here,[143] the patentee must demonstrate that the alleged infringer made, used, offered to sell, or sold an invention that contained all of the components of the claimed system and performed the claimed system's functions. See *Centillion Data Systems, LLC v. Qwest Communications Intern., Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011) ("Qwest manufactures only part of the claimed system. In order to 'make' the system under § 271(a), Qwest would need to combine all of the claim elements – this it does not do. The customer, not Qwest, completes the system by providing the 'personal computer data processing means' and installing the client software"); *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 (Fed. Cir. 2000) ("The claimed invention was a tower crane supported articulated concrete conveyor belt system. As noted earlier, however, Johnson's work on the project focused only on the conveyor components of the concrete delivery systems. Johnson did not work, for example, on the system's crane components, which were designated to be supplied by Potain from either France or within China itself. Therefore, Johnson did not offer to sell the entire invention as claimed in the patent"); see also *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972) ("We cannot endorse the view that the 'substantial manufacture of the constituent parts of (a) machine' constitutes direct infringement when we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts").

To prevail on a claim of induced infringement, the patentee must prove "that there has been

---

Maury did not state that it was pursuing an induced infringement claim, Focus was clearly on notice of the transactions, occurrences, and facts underlying Maury's infringement claim. This distinguishes the case from *O2 Micro International*, where the moving party asserted an infringement theory based on a set of facts it had not previously disclosed. 467 F.3d at 1358. Here, by contrast, Focus knew that Maury's infringement contentions were based on occurrences at the IMS symposium, Focus's website content, and the offer of sale to Northrop Grumman. Focus should reasonably have understood that the acts and transactions alleged might give rise to liability under either § 271(a) or § 271(b).

[143]The parties do not dispute that Claim 1 of the '069 patent is a system claim.

direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002) (citing *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002), and *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)). "In other words "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville*, 917 F.2d at 553. "[T]he specific intent necessary to induce infringement 'requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement.'" *Kyocera Wireless Corp. v. International Trade Com'n*, 545 F.3d 1340, 1354 (Fed. Cir. 2006) (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir.2006) (en banc)).

The accused products at issue here are an IV probe and tuner that, according to Maury, infringe Claim 1 of the '069 patent when they are coupled together. Maury also asserts that Focus produces a "wave probe" that infringes when paired with the tuner in question. Focus contends that merely coupling the accused products together, without adding other equipment, does not infringe Maury's system claim, and that it has not acted to make the accused products available for sale in violation of the trademark statute.[144] As two specific instances of infringement are

---

[144]As noted, Claim 1 is the only claim of the '069 patent that Maury alleges has been infringed. It states, in full:
"A measurement system for conducting measurements on a device-under-test (DUT), wherein impedance is controlled or varied over a set of measurement conditions and a parameter or set of parameters measured for each measurement condition, the system comprising:
a signal transmission line
an impedance controlling tuner including a signal transmission line segment as at least part of the signal transmission line
a low-loss, electrically small signal coupling probe coupled to said signal transmission line in a non-contacting relationship for coupling a sample portion of signals propagating along said signal transmission line to a probe connector or probe transmission line for transmission to a measurement equipment."

alleged, the court addresses each in turn.[145]

### 1.    The IMS Symposium

Maury asserts that Focus infringed the '069 patent by making the IV probe, the wave probe, and the tuner available to two other companies, Rohde & Schwarz and VTD, which used the parts in question to assemble measurement systems that purportedly infringe the patent claims. Focus asserts that it has never "made" or "used" a measurement system that includes all of the component parts identified in Claim 1, as it did not assist Rohde & Schwarz and VTD in assembling the systems they displayed or participate in their demonstrations.

Focus argues first that, by themselves, the probes and the tuner are not the claimed measurement system, since they do not encompass the "transmission line" described in the claim. This is incorrect.   The evidence shows that the transmission line is part of the probes.[146]   As a

_____

'069 Patent, col. 12:63-13:10.

[145]Maury initially alleged that the display on Focus's website of the ZVX setup directly infringed its patent.   Although Maury includes such an assertion in its statement of undisputed facts, it does not argue in its brief that the website display, standing alone, constituted either direct or induced infringement.   The court therefore declines to address the issue. It notes, however, that Maury's assertion is dubious, given undisputed evidence that Focus does not sell products via its website, or offer price quotations for items displayed on the site.   As a result, Maury would be hard pressed to show that Focus made, used, offered to sell, or sold an infringing device simply because the setup appeared on its website.   Nor, without more, would such evidence support a conclusion that Focus induced infringement.   Cf. *Elantech Devices Corp. v. Synaptics, Inc.*, No. C 06-1839 PVT, 2008 WL 4058722, *4 (N.D. Cal. Aug. 27, 2008) ("[I]t is not at all clear that a document contained on a foreign company's website would be sufficient to establish the foreign company intended to induce infringing activity in the United States, even if the document happens to be written in English.   Many people throughout the world read English. . . .   A finding that nothing more than a foreign company's posting of its product information on its own website was sufficient to show intent to induce infringement in the United States would impermissibly extend United States patent protections outside of the territorial boundaries of the United States.   Under such circumstances a more specific showing is required to establish actual intent to induce infringement in the United States"); see also *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526-27 (1972) ("The statute makes it clear that it is not an infringement to make or use a patented product outside of the United States").

[146]Seeley Decl., Exh. H (diagram of IV probe); Ghannouchi Depo. at 260:20-21 ("The IV probe, it's – basically, you have a transmission line and you have a probe coming down and you

result, it appears that Focus's probes and tuner comprise all of the primary components of the system claimed in the patent.[147]

Further, several undisputed facts support the conclusion that Focus induced infringement of the '069 patent.  It is undisputed that Ouardirhi attended the IMS symposium and brought the accused devices into the country.  Ouardirhi undertook these actions knowing that NMDG wanted to include the IV probe in its ZVX Plus setup.[148]  The parties do not dispute the fact that the setups at the symposium infringe Claim 1 of the '069 patent.[149]  Focus adduces *no* evidence raising a genuine dispute of material fact as to these issues.

While it is true that Maury proffers no evidence that NMDG and VTD were Focus's "business partners," despite repeated statements to this effect, it need not establish that fact to prevail; the fact that Focus aided others to infringe with knowledge and specific intent is sufficient.

---

might have, like a – an IV –. . ."); Ouardirhi Depo. at 171:21-22 ("Yes, that's why I asked you to define 'wave probe,' because a wave probe is a transmission line with a wave probe.  Okay, the wave probe is actually just the two . . . the cable bended alone in a transmission line"); Tsironis Depo. at 311:19-22.

[147]Notably, Focus abandons this argument in its reply.

[148]Ouardirhi Depo. at 276:15-25.  Quardirhi testified:
"Q: And when NMDG asked for the IV probe . . .
A: Yes.
Q: . . . did you know what NMDG wanted to use it for?
A: They showed us the . . . yes, they showed us the . . . their set-up.
Q: You understood that NMDG wanted the IV probe so that they could include it in the ZVX set-up?
A: Yes.
Q: So that they could connect it to one of Focus's tuners in the ZVX set up?
A: Yes."

[149]While the parties debate what Focus and Ouardirhi did or did not do at the IMS symposium, it appears undisputed that the setups in question infringed Maury's patent.  (See Maury SUF, ¶¶ 108-11; Maury SGI, ¶¶ 108-11; Tsironis Depo. at 301:25-303:9, 312:5-313:23; Eisenhart Report at 13-39.)  In response to Maury's assertion that the setups infringe, Focus responds only that this is a conclusion of law.  It adduces no evidence that the setups did not infringe.  Consequently, the court concludes that there are no triable issues concerning the fact that the setups infringe the '069 patent.

Moreover, the fact that Focus's employees played no direct role in the assembly of the NMDG and VTD setups does not assist Focus, since the question is whether the company induced third party infringement, not whether its agents engaged in conduct that directly infringed at the IMS symposium.

The undisputed evidence shows that Focus manufactured components of the infringing setup, that its agents brought them into the United States knowing of their intended use, and that they gave them to NMDG so they could create the setups in question.[150] This evidence suffices to prove most of the elements of Maury's claim that Focus induced infringement through its activities at the IMS symposium.

The remaining question is whether Focus specifically intended to induce infringement through its participation in the symposium. There is a dearth of evidence on this subject. Ouardirhi unambiguously testified that he knew NMDG wanted to use Focus's products to create the ZVX setup at the IMS symposium. He also acknowledged brining the probe and tuner to the conference and giving them to NMDG, knowing of their intended use. These facts constitute circumstantial evidence of intent to induce infringement, and Focus adduces no evidence to rebut Maury's proffer. See *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir.2005)("A patentee may prove intent through circumstantial evidence"); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir.1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice"); see also *ICN Pharmaceuticals, Inc. v. Geneva Pharmaceuticals Technology Corp.*, 272 F.Supp.2d 1028, 1048-49 (C.D. Cal. 2003) ("Proof of intent does not require direct evidence, but may be shown using circumstantial evidence").

Knowledge of the manner in which NMDG intended to use the product, and the fact that Ouardirhi brought the accused products into the United States and gave them to NMDG is

---

[150]There is no similar evidence concerning Ouardirhi's knowledge that VTD wanted the probe and tuner for purposes of assembling the SWAP-X402 measurement system. As to this allegedly infringing conduct, therefore, there is no evidence of knowing inducement, much less specific intent to induce infringement.

undisputed circumstantial evidence of specific intent.  Nonetheless, several key elements necessary to support a finding of specific intent are absent from the record.  In *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008), the Federal Circuit approved the following jury instruction:

> "In order to establish active inducement of infringement, it is not sufficient that the company that is allegedly induced to infringe itself directly infringes the claim.  Nor is it sufficient that QUALCOMM was aware of the act(s) that allegedly constitute the direct infringement.  Rather you must find that QUALCOMM specifically intended to cause direct infringement of the [ ] patents, in order to find inducement of infringement.  That is, you must find QUALCOMM is aware of the patent, knows or should have known that the encouraged acts constitute infringement of the patent, and has an intent to cause the encouraged acts." *Id.* at 698.

Maury has not demonstrated that there are no factual disputes concerning these elements. Ouardirhi's testimony is susceptible of different interpretations.  While a reasonable jury could reach the conclusion that Focus possessed specific intent to induce infringement, it could also reach a different conclusion based on its evaluation of Ouardirhi's testimony and credibility. Maury has not adduced undisputed evidence that Focus knew of the '069 patent at the time of the symposium, nor has it adduced evidence that Focus encouraged the third party infringers beyond providing the components they requested.

Consequently, the court concludes that triable issues of fact remains as to whether Focus induced infringement of the '069 patent through its activities at the IMS symposium and that the entry of summary judgment in Maury's favor on this claim is not warranted.

### 2.    The Offer of Sale to Northrop Grumman

Maury also alleges that Focus directly infringed the '069 patent by offering to sell certain parts to Northrop Grumman.  A Focus employee quoted the price for a "multi-harmonic load-pull system" that included a tuner and an IV probe.  While the tuner and the IV probe would not have been coupled when sold, Focus understood that Northrop Grumman intended to connect them as part of a measurement system.  When Focus learned the scope of Maury's patent, it withdrew the

offer of sale and "cancelled the deal," acknowledging that it was possible that the sale would infringe Maury's patent.

There is no dispute that the price quotation was an "offer to sell" within the meaning of § 271(a).  While Focus contends that the quotation did not include all the components necessary to create a measurement system, i.e., it did not include "measurement equipment" and "cabling," such items are not claimed in Claim 1 of the '069 patent.  Focus disputes this, arguing that the third component of the claimed system – "a low-loss, electrically small signal coupling probe coupled to said transmission line for coupling . . . to a probe connector or probe transmission line for transmission to a 'measurement equipment'" shows that the system includes measurement equipment.[151]  As Maury notes, this is not a factual argument, but rather an argument concerning proper construction of the claim.  The court's claim construction order has already addressed this contention and concluded that the term does not include "measurement equipment."  Focus's argument, therefore, is unavailing.[152]

Similarly, Focus's assertion that "cabling" is a necessary part of the claimed system is unavailing.  The claim itself does not mention cabling, and Focus's argument that there must be cabling for the measurement system to operate is not supported by argument or evidence in the record.  Focus's "disputes" are therefore immaterial and do not raise triable issues of fact regarding Maury's direct infringement claim.

The undisputed evidence in the record demonstrates that Focus made an "offer to sell" infringing products to Northrop Grumman.  Consequently, Maury is entitled to have summary judgment entered in its favor on this claim.[153]

---

[151]'069 Patent, col.13:9-10.

[152]Claim Construction Order at 88.

[153]Maury's motion for summary judgment and its opposition to Focus's motion indicate that it does not seek damages for this act of infringement, but only injunctive relief.  (See Maury MSJ at 25 ("There is no genuine issue of material fact that Focus has infringed the '069 patent and will do so in the future unless enjoined"); Focus MSJ Opp. at 24 ("Focus wants its business partners to sell Focus' probes in the United States.  Maury needs an injunction [against its] do[ing] that").)

### III.  CONCLUSION

For the reasons stated, the court rules on the parties' motions for summary judgment as follows:

- As respects infringement of the '293 patent, the court grants Maury's motion for summary judgment and denies Focus's motion;

- As respects infringement and invalidity of the '629 patent, the court grants Maury's motion for summary judgment and denies Focus's motion;

- As respects infringement of the '069 patent, the court denies both parties' motions for summary judgment on Maury's induced infringement claims, but grants Maury's motion for summary judgment on its claim of direct infringement arising from Focus's offer of sale to Northrop Grumman and denies Focus's motion.

DATED: July 30, 2012

_Margaret M. Morrow_
_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

Indeed, it is difficult to discern how a withdrawn offer of sale could have resulted in any damages to the patentee.  Further clarification of the precise nature of the relief Maury seeks, however, would assist the court in fashioning an appropriate judgment.